[No. 13558. Department Two. December 29, 1916.]

KING COUNTY, *Appellant*, v. SEATTLE CEDAR LUMBER
MANUFACTURING COMPANY, *Respondent*, ANNA
ANNAND et al., *Defendants*.[1]

EMINENT DOMAIN — COMPENSATION — DAMAGES — READJUSTING
BUILDINGS—REDUCING EXPENSE. Under a liberal construction of the
constitutional provision requiring payment for private property
taken for public use, and the general rule requiring one who is dam-
aged to do what he can to minimize his damages, a property owner
may recover damages in eminent domain proceedings to cover the
cost of readjusting its buildings in contemplation of a second con-
demnation, where, after a condemnation to raise water in a canal
to a seven-foot level, it was known that the government would raise
the water two feet further and another condemnation therefor would
be necessary; and a readjustment of the buildings to the seven-foot
level by one operation, and afterwards to the nine-foot level, would
have doubled the expense; since the property owner was not pro-
ceeding voluntarily to readjust its property and was in duty bound
to minimize the damages, and the rule limiting damages to the
value of the property at the time of the trial would not be just.

Appeal from a judgment of the superior court for King
county, Mackintosh, J., entered March 16, 1916, upon the
verdict of a jury awarding damages in condemnation pro-
ceedings. Affirmed.

*Alfred H. Lundin* and *S. M. Brackett*, for appellant.

*Higgins & Hughes* (*Hyman Zettler*, of counsel), for re-
spondent.

HOLCOMB, J.—In 1895, King county, in accordance with
its agreement with the United States government, in aid of
the proposed government canal to connect Salmon Bay with
Lake Washington and Lake Union, instituted and prose-
cuted to final judgment three certain condemnation actions
against shore land owners, paid the damages awarded
therein, and conveyed to the government of the United States
all rights thereby secured. Each of those actions was for the

[1]Reported in 162 Pac. 27.

purpose of acquiring a different right of way through a different strip of territory and the right to flood adjacent property necessary for the canal "according to the existing plans of the United States government." The plans and specifications for the canal which had been officially adopted by the government call for raising the waters, ultimately, to a height of nine feet above city datum and flooding the adjacent property to that level. In two of the cases, the condemnation judgment appropriated the right to flood to the level required by the government plans, which were made a part of those proceedings, viz., nine feet above city datum. In one of those actions, King County v. Allen, which affected the property around Salmon Bay, including respondent's property, the judgment specifically recited that the right was acquired only to bring the waters up to a level of seven feet above city datum. The right to raise the waters to a level of nine feet above city datum was disputed by these property owners, and the government desires ultimately to raise the waters of the canal nine feet above city datum. It is conceded that the county acquired the right to raise the waters of the canal at any time to the level of seven feet above city datum. To put the controversy at rest as to the difference of two feet, this action was brought by order of the board of commissioners of King county. Upon the trial, the court held, as to the property involved in the two old cases, that King county had acquired the right to flood to nine feet because the judgment recited that the property was to be flooded to the levels of the plans adopted by the government, which plans provided for bringing the waters up to nine feet. As to the property around Salmon Bay and which was included in the third suit, the court held that the right was acquired to only seven feet because the judgment specifically recited that the right was condemned to flood to that elevation only, and it therefore impaneled a jury to try out the damages for raising the water the additional two feet.

Upon the question of the damages which would be caused to the property of the respondent by the proposed improvement, the trial court, over the objection of appellant, allowed respondent to introduce testimony to the effect that, in January, 1915, W. H. McEwan, an officer of respondent company, asked Major Cavanaugh, United States engineer in charge of the construction of the canal locks, when the government intended to raise the waters of the canal. The witness testified that Major Cavanaugh replied that, while he could not say definitely, there was a possibility that in July, 1915, the government might wish to raise the water to an elevation of one or two feet above city datum; that the water would not be raised to the nine-foot level until December 1 or perhaps later. The witness testified that the water raised even to the height of two or three feet above city datum would have caused a shut down of the mill; that to raise the mill without a shut down would require several months' time; that Major Cavanaugh, when asked if he would advise respondent to commence raising the plant at once, stated that he had told the respondent the facts and that respondent must use his own judgment, and refused to give any advice upon the subject; that, prior to the formal notice of February 12, the witness, in company with Mr. Hughes, his attorney, called upon Mr. Evans, deputy prosecuting attorney of King county, who informed them that he had been working upon the preparation of the present condemnation suit, and that he had tried to get the commissioners to employ an engineer to get the levels of the property to discover its then condition; that the witness urged that these levels be taken at once before any alterations or adjustments were made; that Mr. Evans asked respondent to delay the proposed change for a week in order that he might again try to have the commissioners authorize some one to take levels upon existing buildings; that the respondent waited a week, heard nothing from Mr. Evans, and then proceeded to raise the shingle kiln; that Mr. Evans at this conference gave respondent no assur-

ance that respondent would be protected in making any changes prior to the date of the trial. On February 12, 1915, respondent gave notice to the prosecuting attorney of King county that it would, on February 19, 1915, start making the adjustment occasioned by the raising of the water above the seven-foot level. It was stated in that notice that it was for the protection of the county so that it might have its county engineer and other appraisers on the ground during the ensuing week to check the figures of the lumber company either as to the cost of making the adjustments it proposed or the necessity therefor, and it was stated that it was impossible to wait any longer than the above date, as the making of the adjustments was a matter that would take many months and it had been notified by the government that it should proceed with dispatch in the matter.

No response was made by King county or the county attorney to the foregoing notice and, on the 19th of February, respondent began to adjust its plant, taking it up section by section so as to keep the mill running in the meantime. It would appear that there were two courses open to it. It could readjust its property to the seven-foot level, thereby protecting its property, and when the water was raised to the nine-foot level, six or eight months away, then make a second adjustment from the seven-foot level to the nine-foot level to protect itself against the last raise; or it could make all its readjustments in one, in advance, and have its mill in proper shape to meet the canal conditions when finally completed. The government had been actively engaged in building the canal for two years or more prior to February, 1915, and at that time the canal was largely dug and the locks were being constructed so as to bring the water up to the nine-foot level when completed.

It seems that the first alternative of the lumber company, that of making the readjustment in two stages, would be twice as expensive as the second, and would have resulted in the waste of thousands of dollars. Consequently the least

costly method was adopted and the whole readjustment to meet the plan of the canal as completed was made at once. The evidence is undisputed that, had the readjustments been first made to the seven-foot level and had the respondent waited to make the second readjustment until after the trial of the condemnation action, the amount of damages to which it would be entitled in this proceeding on account of the second readjustment would have been several times what it obtained below by virtue of its having completed the readjustment at once.   In other words, the cost of the readjustment from seven feet to nine feet, to pay for which this condemnation proceeding was instituted, would be increased at least two-fold by making the change in two adjustments, first to seven feet and then to nine, instead of in one operation. Therefore, by anticipating the necessity of making the final adjustment, the damages payable by King county in this proceeding were undoubtedly cut in half.   At the time of the trial, the shingle dry kiln and the eastern tramways had been adjusted to the nine-foot level.   The remainder of the mill, although it was in process of adjustment, had not been raised above the seven-foot level.   The admitted additional cost for carrying these parts of the mill on up two feet higher, which was necessitated by the county's condemnation so as to be above nine feet, was $3,762.66.   It was further conceded that, had they been adjusted at seven feet, it would have cost several times as much to then raise them up to nine feet.

At the conclusion of the evidence, the court submitted this issue to the jury under the following instruction:

"You are instructed that if these necessary changes, if any, have already before the trial of this case been made, still you may consider them in estimating the property owners' damages, if you find that those changes were made solely because of these improvements and were made prior to the trial only because such earlier alterations would reduce the damages to be caused by this improvement and because it was necessary to start making such adjustments in order to be

above water when the canal was opened and were not made voluntarily."

The jury thereupon found in favor of respondent on these items and brought in a special verdict of $3,762.66 for the adjustment so made, representing that portion of the cost thereof of adjusting the property from the seven-foot level to the nine-foot level. This item of recovery is the sole subject of dispute.

It is the contention of the appellant that the respondent cannot recover damages even in the amount to which it lessened it. It contends that a property owner, learning that a condemnation suit is liable to be commenced against him aimed at acquiring a right to land by flooding it, is not entitled, prior to the commencement of the suit, to alter the condition of his buildings and, when the suit is finally instituted, prove as an element of damages the cost of raising his building above the flood level, when the work of raising was done without any assurance by the petitioners that the owner would be protected therein. Our decisions in *Grays Harbor & P. S. R. Co. v. Kauppinen*, 52 Wash. 238, 101 Pac. 835, and *Distler v. Grays Harbor & P. S. R. Co.*, 76 Wash. 391, 136 Pac. 364, are cited to the effect that the rule fixing the value of the property as of the time of such trial is not only definite, but just to both the owner and the public. Moreover, it would seem that no other construction could be adopted without doing violence to the language of our constitution. And in the *Distler* case, where the respondent railway company had constructed its line upon a city street without having first condemned the right to do so as against the adjacent property owners, the court held that in this state the rule applicable to condemnation proceedings is that the damages shall be ascertained as of the time of trial.

It is then contended that, the date of the trial being fixed as the time at which damages are to be estimated, the owner may improve his property to that date, and may recover the value of the improvements if taken, or their damages if they

are damaged. Conversely; that if the property owner, of his own motion without any contract or assurance that he will be protected in so doing, alters his property prior to the trial so that the proposed improvements will not injure his buildings in their altered condition, the condemning party shall not be called upon to pay damages where no damages can be suffered; that the respondent in this case acted upon its own advice and at its peril.

We think appellant takes too narrow a view of the effect of our own decisions and of the provision of our constitution relating to the taking and damaging of private property for public purposes. From the beginning of our jurisprudence under our constitutional provision, we have consistently held that this constitutional provision shall be liberally construed in favor of the private property owner. The language of the constitution is to be construed liberally so as to carry out and not defeat the purposes for which it was adopted. 1 Lewis, Eminent Domain, § 360.

It cannot be said that the respondent here was proceeding voluntarily to adjust his property to the requirements of the government in the construction of the canal, for the government undoubtedly had the intention to construct the canal so as to raise the water finally to the level of nine feet above city datum. It had the acquired right to raise it to seven feet. It was known that the right to flood the additional two feet would be positively required. The county proceeded for no other purpose than to acquire the right, which it had not acquired as to these property owners, to raise the water from the seven-foot level to the nine-foot level. It was known that, when the government should raise the water to that level, respondent's property would be injuriously affected and damaged thereby. To have left the mill in a condition to meet the flooding of the water to the seven-foot level would have been certainly to repeat the operation of readjusting it so as to meet the condition of raising the water to the nine-foot level. It is a general rule in this state and elsewhere that the

law insists that one who is damaged shall do what he can to minimize his damage. In the case of *In re Trustees of New York & Brooklyn Bridge*, 18 App. Div. 8, 45 N. Y. Supp. 484, Judge Cullen, for the court, discussing a similar situation, where the owner was proceeding to erect a building when he was notified of the intention to condemn a portion of his lot, and the owner, immediately before the bringing of the condemnation proceeding, ordered his plans changed, tore down a portion of the building on part of the lot to be condemned so as to conform to the proposed improvement and lessen the damages to his property by reason of the improvement, and incurred expenses therefor, said:

"This is not the ordinary case of a landowner seeking damages because his inchoate and unexecuted intention to improve the property in some particular manner is necessarily modified or frustrated. The work of constructing the building was actually prosecuting at the time of notice. It may be that the defendants were not prevented from continuing their improvement until the time the property was actually acquired. In such case the plaintiffs would have been compelled to pay for the injury to the structure. Now, assuming that the defendants had that right, still the fact that they adopted the other course of at once modifying their building in accordance with the notice given them by the trustees, and thus saving expenditures unnecessarily to be made, should not operate to their prejudice. Their action in proceeding at once to change the plan of the building and its construction was in the interests of the plaintiffs, as well as to their own. Whatever may be the general rule governing awards in condemnation proceedings, there may be special circumstances taking any particular case out of the rule. It would shock our sense of justice that in this case the defendants should not be allowed the actual cost and expenditure incurred by them in changing the plan of their structure."

A like case is found in *St. Louis v. Brown*, 155 Mo. 545, 56 S. W. 298. At the time of the passage of an ordinance authorizing the taking of thirty-five feet from the lot by condemnation, the owner was proceeding to erect a large build-

ing on the property. Immediately upon the signing of the ordinance and before the institution of the condemnation proceedings, the owner adjusted a part of the building already constructed so as to meet the condemnation plan and reduce the damages. The cost of so readjusting amounted to some $7,800, and was included in the amount of damages in the subsequent condemnation award. In holding that the award was proper, the court said:

"When this ordinance was approved, defendant Brown's contracts were let for the construction of his building at the cost of $252,000. What was his duty under the circumstances? Should he have gone on with the construction, and magnified the damages the city should pay him, either with the determination to resist the enforcement of the ordinance or with a view to making it as costly a proceeding as possible to the city? Or should he suspend all operations until the cause and been carried through the courts, and its result definitely known? Good faith and justice demanded, in the words of this court last cited, that he should use 'all reasonable exertion to protect himself and avert as far as practicable the injurious consequences of such act.' . . . He took the most conservative and prudent course, gave faith to the city in carrying out its ordinance, and averted, as far as possible, the damages consequent on the city's act. . . . If he is to have no compensation here for that loss, then he is damaged to that extent by this act of the city, and he has no other redress."

In *Peck v. Chicago Railways Co.*, 270 Ill. 34, 110 N. E. 414, the court said:

"A person injured by another's breach of contract or tort is bound to use reasonable care to render the injury as light as possible and to protect himself from unnecessary injury. . . . Expenses reasonably and prudently incurred in good faith in making a proper effort to diminish the loss may be recovered, whether the effort is successful or not. . . . It is true that in this case there is no breach of contract or tort. The declaration makes no charge of negligence or complaint as to the manner in which the improvement was made or the skillfulness with which the labor upon it was performed. The damages must therefore be estimated under the same rules

as upon a petition to condemn the property. We see no reason why a different rule should prevail in such a case, and if from the evidence it appears that expenses were incurred by the appellees in good faith and the exercise of a reasonable and prudent judgment in an effort to reduce the damages, those expenses should be regarded as a part of the damages to their property."

In *Chicago, S. F. & C. R. Co. v. McGrew*, 104 Mo. 282, 15 S. W. 931, the court said:

"It is the duty of one sustaining damages by reason of the act of another to use all reasonable exertion to protect himself and avert, as far as practicable, the injurious consequences of such act. . . . It was, therefore, plaintiff's duty to adjust his property to its changed condition as soon as it could reasonably be done, and in such manner as would avert such damages as could be avoided by reasonable endeavors and expense."

We consider the reasoning of the foregoing cases exactly applicable to the case at bar, that the respondent did no more than its duty, and the appellant is in duty bound to rebate the respondent's loss and damage occasioned it by the readjustment of its property to meet the needs specified in the condemnation proceeding. This is manifestly all that was done by the court and jury.

The verdict and judgment are therefore affirmed.

MORRIS, C. J., MOUNT, FULLERTON, and PARKER, JJ., concur.