[No. 30212.   Department Two.   December 11, 1947.]

LAWRENCE D. SULLIVAN, *Respondent,* v. BOEING AIRCRAFT COMPANY, *Appellant.*[1]

J. *Charles Dennis* and *Frank Pellegrini* (*Holman & Sprague* and *J. Paul Coie,* of counsel), for appellant.

*Gershon, Stark & Oseran,* for respondent.

[1] Reported in 187 P. (2d) 312.

STEINERT, J.—Plaintiff brought suit against his employer to recover a specified amount of wages which he alleged he would have earned and received had not the employer violated plaintiff's seniority rights created and established by the labor relations agreement governing his employment by the defendant. The cause was tried to the court without a jury. Upon the conclusion of the evidence, the court took the matter under advisement and thereafter rendered a memorandum decision dismissing the action without prejudice. On motion of plaintiff, the hearing of the cause was reopened and further evidence was taken, at the conclusion of which the court rendered an oral decision reversing its former decision and awarding to the plaintiff recovery in an amount determined by the court. In accordance with its oral decision, the court subsequently made and entered findings of fact, conclusions of law, and judgment in favor of the plaintiff. Defendant appealed.

The facts are undisputed. Appellant, Boeing Aircraft Company, is a Washington corporation engaged in the business of manufacturing aircraft. At the time involved in this action, the company had eleven separate plants located in the area of Seattle and neighboring cities and towns. Each of the plants was divided into shops. One of the plants, with its shops, was located at Renton.

On or about January 1, 1944, appellant entered into a labor relations agreement with International Association of Machinists and Aeronautical Industrial District Lodge No. 751 of the international association. The general purposes of the agreement were to provide for the operation of all of appellant's manufacturing plants under methods which would further to the fullest extent possible the safety of employees, economy of operation, quality and quantity of aircraft produced, cleanliness of plant and product, and to provide for collective bargaining with respect to rates of pay, wages, hours of employment, and other conditions relative thereto.

For several months immediately prior to May 1, 1944, respondent, Lawrence D. Sullivan, a member of Aeronautical Industrial District Lodge No. 751, was employed by

appellant as an "A" riveter in one of the shops in its Renton plant. During that period of time, he worked on the first shift, beginning at seven-thirty a. m. and ending at four p. m. As such employee he received $1.20 an hour. His wife also worked at the same plant and on the first shift, but in a different shop. Respondent and his wife rode to and from work in their automobile and, at the same time, in pursuance of what was termed a "share-the-ride plan," carried with them other employees who worked on the first shift.

On April 30, 1944, appellant through one of its general shop foremen gave respondent a "shift change" notice, directing him to report for work on May 1st on the second shift, in the same shop, instead of on the first shift. The second shift was from four p. m. to twelve-thirty a. m. Respondent was transferred to the second shift because, at that time, he was the junior "A" riveter on the first shift in his shop; however, he was senior to some "A" riveters on the first shift in other shops of the same plant, and, on the other hand, there were also some "A" riveters, senior to respondent, holding jobs on the second shift. The reasons assigned by appellant's foreman for making the change were because of production requirements and the necessity of equalizing the shifts.

There is no claim by respondent that the change was made in bad faith or with bad intent on the part of the appellant. It is also conceded by respondent that the change of shift involved no change in job classification, job evaluation, or job title, and that the pay on the second shift was $1.30 an hour, as compared with $1.20 for the first shift.

Respondent refused to report for work on the second shift as directed. The reasons given by him for his refusal were that "it was most impractical and inconvenient for him to perform services during any other shift"; that it was impossible for him and his wife to work on different shifts; that he was transporting "share-the-riders" working on the first shift; and that the transfer from the first to the second shift was in violation of his seniority rights under the labor relations agreement which governed his employment.

Although respondent failed and refused to obey the order, appellant did not discharge him from its employ, but it would not permit him to work on the first shift; respondent, in turn, would not report for work on the second shift. This state of affairs continued for a period of seventy-four days, from May 1 to July 14, 1944, at the end of which time, as a result of a decision by an arbitrator, as hereinafter more particularly explained, respondent was reinstated in his position on the first shift. During the period of his absence from work, however, respondent continued to carry his "share-the-riders" to and from the plant.

The labor relations agreement contained provisions for the arbitration of grievances and disputes between the employees and the company. Pursuant to those provisions, respondent on May 1, 1944, filed a written "grievance," upon a form used by the union for that purpose, alleging that the action taken by the company in transferring him from the first shift to the second shift was in violation of certain specified provisions of the labor relations agreement, and claiming pay for time lost because of such transfer. The arbitrator to whom the grievance was submitted sustained respondent's contention to the extent of holding that seniority rights were determinable on a plant-wide basis, and that on such basis respondent was entitled to retain his position on the first shift. However, the arbitrator did not consider respondent's claim for lost wages and made no decision on that phase of his grievance.

On receipt of notice of the arbitrator's decision, appellant company promptly reinstated respondent in his position on the first shift. Respondent thereupon made demand for back pay, and, on the company's refusal to comply with the demand, instituted this action to recover the amount of his lost wages.

One of the questions discussed at length in the briefs is whether the grievance procedure which was followed in this instance constituted either a valid arbitration or a valid appraisement, or appraisal, under the law of this state. The authorities cited, together with some which we have added, bearing on that question, are the following: Rem.

Rev. Stat., §§ 420 to 430, as amended by Rem. Supp. 1943, §§ 430-1 to 430-23 [P.P.C. §§ 8-31 to 8-75] (further amended by chapter 209, p. 890, Laws of 1947); *Dickie Mfg. Co. v. Sound Construction & Engineering Co.,* 92 Wash. 316, 159 Pac. 129; *Martin v. Vansant,* 99 Wash. 106, 168 Pac. 990, Ann. Cas. 1918D, 1147; *State ex rel. Fancher v. Everett,* 144 Wash. 592, 258 Pac. 486; *Stevenson v. Hazard,* 152 Wash. 104, 277 Pac. 450; *Gord v. Harmon & Co.,* 188 Wash. 134, 61 P. (2d) 1294; *In re Arbitration Puget Sound Bridge & Dredging Co. v. Lake Washington Shipyards,* 1 Wn. (2d) 401, 96 P. (2d) 257; *Hegeberg v. New England Fish Co.,* 7 Wn. (2d) 509, 110 P. (2d) 182; 3 Am. Jur. 830, Arbitration and Award, § 3; 6 C. J. S. 153, Arbitration and Award, §. 1.

The determination of that question here, however, would not finally dispose of this controversy; and, moreover, under our view of the case, the result would be the same regardless of whether or not the grievance procedure constituted either a valid arbitration or a valid appraisement or appraisal. For these reasons, we refrain from passing on that question and will proceed to the consideration of two other questions presented by appellant's assignments of error.

The first of these questions is whether, in transferring respondent from the first shift to the second shift, the appellant company violated the seniority provisions of the labor relations agreement. Appellant contends that its act did not amount to a violation; respondent contends that it did.

The pertinent provisions of the labor relations agreement read as follows:

"Article 7
"Seniority
"Transfer, Layoff, Rehire, Discharge
"Section A. Seniority
"1. Seniority herein provided for shall be on a company-wide basis and shall prevail in the Company's plants covered by this agreement.
"2. Seniority is the term applied to Company service of individual employees by which standing in relation to the service of other employees is compared. . . .
"Section D. Transfers

"1. If production requirements necessitate, the Company may make transfers from one shop, job or shift to another within the type of work for which the employee is qualified under the following conditions:

"a. If such transfers are within the same plant and shift, *there shall be no restrictions* on the Company's right to use employees having the same job title anywhere it chooses.

"b. If such transfers involve change in plant or shift, but no change in job title, the Company *shall have regard to seniority* within such job title.

"c. If such transfers involve a change in job title within the same labor grade, the Company also *shall have regard to seniority* within job titles. . . .

"d. This paragraph 1 shall become inoperative at the end of the unlimited National Emergency as proclaimed by the President of the United States, and thereafter transfers *will be governed by seniority* providing the employee is competent and qualified.

"2. The Company will transfer qualified employees upon request to more desirable shifts where vacancies occur in their respective departments. In the selection of employees for such transfer, *seniority shall prevail.*

"3. In case of openings in higher paid brackets of work, such openings shall be filled by capable employees in lower paid brackets. The employee with seniority *shall be given first opportunity* and if found incompetent by the shift committeeman and shop foreman, the person next in line *will fill the opening.*" (All italics ours.)

As appears from the italicized words above, the phraseology with reference to the application of the rule of seniority differs in the various situations indicated by the respectively numbered and lettered paragraphs. By section D-1, subds. b and c, the company in making transfers involving change in plant, shift, or job title *shall have regard to seniority*; these provisions, together with that contained in subd. a, were to operate, however, only during the period of unlimited national emergency. By section D-1, subd. d, transfers *will be governed by seniority*; this provision was to become operative only after the termination of the national emergency. By section D-2, covering transfer of qualified employees, on request, to more desirable shifts,

*seniority shall prevail*; and by section D-3, relating to the elevation of employees to higher paid brackets, the employee with *seniority shall be given first opportunity.* These last two subsections were to be operative at all times.

Thus we note these different forms of expression: (1) "shall have regard to seniority"; (2) "will be governed by seniority"; (3) "seniority shall prevail"; and (4) "seniority shall be given first opportunity."

It is conceded that appellant's order directing the change in the shift on which respondent was to work was made during the period of unlimited national emergency. The situation therefore falls within section D-1, subd. b, which required that appellant "shall have regard to seniority," rather than within D-1, subd. d, which provides that transfers "will be governed by seniority," or within D-2 or D-3.

It is appellant's contention that the term "shall have regard to seniority," as applied to the transfer of personnel during the period of unlimited national emergency, means simply that the company was required to take into consideration seniority, *as one of the several factors,* in making the transfer; or, conversely stated, that the company could not arbitrarily disregard seniority in transferring an employee from one shift to another. It concedes that, after December 31, 1946, when the president declared the cessation of hostilities, it would be bound to observe and make transfers strictly on the relative seniority of the parties concerned, other things being equal. Respondent, on the other hand, contends that the term "shall have regard to" has the same force and effect as the term "governed by."

Among the definitions of the word "regard," when used as a verb, we find the following:

"To look to, consider, take into account." Oxford Dictionary.

"To take into consideration or account; to take account of; to consider." Webster's New International Dictionary.

When used as a noun, the word has been given the following definitions:

"Attention, heed, or consideration, given to a thing or person, as having an effect or influence on one's actions or

conduct; respect or deference paid *to*, or entertained *for*, some authority, principle, etc." Oxford Dictionary.

"Attention of the mind with a feeling of interest; consideration; heed; care; interest; concern; attention or respect as shown in action or conduct." Webster's New International Dictionary.

By the same lexicons, the word "govern" has been given the following definitions:

"To constitute a law or rule for; to be applicable to as a determining principle or limiting condition; to serve as a precedent, rule, or type for; esp. in *Law*, to serve in determining or deciding (a case)." Oxford Dictionary.

"To be a rule, precedent, law, or deciding principle for; to apply to in a determining or deciding way." Webster's New International Dictionary.

It is a familiar rule, with reference to the interpretation of contracts, that, in the determination of the meaning and application of specific words and expressions, the entire context and subject matter of the agreement may be taken into consideration. *Hunter v. Wenatchee Land Co.*, 50 Wash. 438, 97 Pac. 494; 12 Am. Jur. 777, Contracts, § 242; 17 C. J. S. 744, Contracts, § 321.

Taking into consideration the scope and purposes of the labor relations agreement, the necessitous conditions existing by reason of the national emergency, and the fact that the parties to the agreement themselves used different terms to cover different situations, rather than one term to cover all, we are of the opinion that the expression "shall have regard to seniority," as used in the agreement, was not intended to have the same meaning as "will be governed by seniority." We think the term "shall have regard to seniority" means simply that the company was required to take the matter of seniority into consideration, together with all the other factors presented by the particular situation; and, if upon such consideration there was reasonable ground for making the transfer, and no arbitrary disregard of respondent's seniority rights, the company would be permitted to make such change.

One of the paramount purposes of the agreement was "to further to the fullest extent possible . . . the quality and quantity of aircraft produced." The uncontradicted evidence is that the transfer was made in good faith, because production requirements necessitated the equalization of the shifts. Respondent was the junior "A" riveter in the particular shop, though not the junior in the entire plant. There were also "A" riveters in the plant, serving on the second shift, who were senior to respondent. Taking all these things into consideration, we are of the opinion that appellant acted within its rights in transferring respondent to the second shift.

The other question presented by appellant's assignments of error is whether respondent should be denied recovery in this action for an additional reason, namely, because of his failure to mitigate his damages resulting from the loss of wages.

It should be remembered that appellant did not discharge respondent, but simply directed him to perform work on another shift; and that respondent did not terminate his employment, but insisted on his right to work on the first shift and refused to work on the second shift.

The labor relations agreement contained a provision reading as follows:

"Article 10
"WAGES
" . . .

"Section C. Wage Payment Basis
"Employees shall be paid for time *actually worked* computed to the nearest one-tenth (1-10th) hours." (Italics ours.)

It is the general rule in this state, as it is elsewhere, that one who has sustained damage by reason of the act of another must use reasonable efforts to minimize his damages. *King County v. Seattle Cedar Lbr. Mfg. Co.*, 94 Wash. 84, 162 Pac. 27, L. R. A. 1917C, 1184; *Peninsular Sav. & Loan Ass'n v. Breier Co.*, 137 Wash. 641, 243 Pac. 830; *Hoff v. Lester*, 25 Wn. (2d) 86, 168 P. (2d) 409; 15 Am. Jur. 420, Damages, § 27; 25 C. J. S. 502, Damages, § 34.

■ Under the war restrictions existing at that time, respondent was not required, nor was he able, to seek or secure employment in another industry. He could, however, have taken employment on the second shift until his grievance had been decided, whether by arbitration or otherwise. By doing so he would have suffered no loss of wages, and the company would not have temporarily lost his services in the national emergency. His reason for insisting on remaining on the first shift was that "it was most impractical and inconvenient for him to perform services during any other shift." The only grounds of inconvenience stated by him at the trial were that his wife worked on the first shift, and that he carried "share-the-riders" to work with him. We do not consider these inconveniences sufficient to outweigh the necessities of production requirements, under the circumstances presented here.

The situation as thus presented with reference to seniority gave rise to a difference of opinion between appellant and respondent, and, to have that difference resolved, the parties by agreement resorted to the arbitration procedure, with full intent on the part of both to abide the decision. During that period of time, it was the duty of the respondent, under the general rule above stated, to minimize his damages, by reporting to work on the second shift. Had he done so, he would have suffered no loss in dollars and cents but, in fact, would have earned ten cents an hour more than he had been earning on the first shift. The period of emergency with which the country was then confronted was not the time for refusing to perform war work because of the personal inconveniences urged by him.

For both of the reasons hereinabove stated, the judgment is reversed, with direction to the trial court to dismiss the action.

MALLERY, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.