[L. A. No. 27930. In Bank. Jan. 22, 1965.]

CHARLES B. ALBERS, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES, Defendant and Appellant.

[L. A. No. 27931. In Bank. Jan. 22, 1965.]

PALOS VERDES WATER COMPANY, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES, Defendant and Appellant.

[L. A. Nos. 27932, 27933. In Bank. Jan. 22, 1965.]

RANCHO PALOS VERDES CORPORATION et al., Plaintiffs and Appellants, v. COUNTY OF LOS ANGELES, Defendant and Appellant.

(Two Cases.)

Lillick, Geary, McHose, Roethke & Myers, Lillick, Geary, McHose & Roethke, John C. McHose, Anthony Liebig and David Brice Toy for Plaintiff and Appellant in L. A. No. 27930.

Pollock & Deutz, John P. Pollock and Samuel C. Palmer III for Plaintiffs and Appellants in L. A. Nos. 27931-27933.

P. M. Barceloux, Burton J. Goldstein, Goldstein, Barceloux & Goldstein and Reginald M. Watt as Amici Curiae on behalf of Plaintiffs and Appellants.

Harold W. Kennedy, County Counsel, and Lloyd S. Davis, Chief Trial Deputy County Counsel, for Defendant and Appellant.

Harry S. Fenton, R. B. Pegram, Richard L. Franck and Charles E. Spencer, Jr., as Amici Curiae on behalf of Defendant and Appellant.

DOOLING, J.*—In these four consolidated actions the plaintiffs, on the theory of inverse condemnation, were

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

awarded judgments aggregating $5,360,000. The county's appeals are taken on a clerk's transcript so that the county cannot and does not contend that the findings are not supported by the evidence. A number of the plaintiffs have also appealed from the judgments. Those appeals will be considered after disposing of the questions raised on the county's appeals.

The litigation grows out of a major landslide which commenced in 1956, and is still continuing, in the Portuguese Bend area of the Palos Verdes Hills, situate along the southerly coastline of the Los Angeles Basin. Palos Verdes Hills form a peninsula which extends into the Pacific Ocean east of Santa Monica and west of San Pedro. Portuguese Bend is a small bay or inlet situate between two minor peninsulas (Portuguese Point and Inspiration Point) on the southerly coastline of the larger peninsula. The Portuguese Bend area also includes Portuguese Canyon, which extends north from the inlet to the crest of the Palos Verdes Hills. In the twenties development commenced in the area, resulting in the establishment and construction of both residential sites and a yacht club (the latter including summer home sites). By the early fifties, a large portion of this land had been improved and built upon, and an additional area was being held for subsequent subdivision. However, no direct access from the main Los Angeles Basin (i.e., southerly through the Palos Verdes Hills) had been provided, and access was only along the coast road (Palos Verdes Drive South) from Santa Monica or San Pedro. In the thirties, the County of Los Angeles commenced planning the extension of Crenshaw Boulevard (then Prairie Avenue) from the metropolitan area southerly through Palos Verdes Hills to connect with the coast road near Portuguese Bend. Such planning was with the concurrence and cooperation of the then owners of the larger tracts being developed and to be developed. However, World War II intervened, and it was not until the late forties and early fifties that planning was resumed. The various corporations interested in developing the area gave the county written grants of easement required for the road as planned at that time, and further granted oral approval of changes as the work progressed.

A well-defined portion of the Portuguese Bend area, extending approximately 1¼ miles along the coast and ¾ of a mile inland (toward the crest of the hills), constitutes a prehistoric slide area. That fact was known to geologists prior

to the first development in the twenties, and is the subject of a federal government geological report published in 1946. According to that report, which was known to both the county and the developers, the prehistoric slides were due to slippage on a plane of betonitic strata which underlay the surface at varying depths, but inclined at an angle roughly parallel thereto, from the crest of the hills to a line far offshore. Although the ground indicated a series of both major and localized slides at various prehistoric times, no slide was believed to have occurred within the past several thousand years. The experts believed the area to be at rest, and did not anticipate further sliding unless something occurred to either increase the pressure upon the slippage plane, or remove the forces which were being exerted to hold the upper layer in place.

In 1956 a slide was triggered in the northeast corner of the area as a result of pressure exerted by some 175,000 cubic yards of dirt which was placed both in the road easement and (with the consent of the developers) on either side of the easement. Within a short time that slide spread, extending to almost the entire prehistoric slide area. That area is still moving slowly toward the ocean, causing the damages of which complaint is made.

The plaintiffs consist of the corporations which own both developed and undeveloped areas affected by the slide (including the yacht club), the Palos Verdes Water Company, whose water distribution system was damaged by the slide, and many residents whose homes were destroyed or damaged. The complaints alleged causes of action predicated on a theory of negligence, as well as causes of action based on inverse condemnation. By way of answer (and in some instances cross-complaint) the county denied liability under both theories, and alleged contributory negligence of the various plaintiffs, and fraudulent concealment of facts on the part of the developers.

The trial judge, having specifically *found an absence of negligence or contributory negligence* on the part of any party, and having also found that the evidence did not include the necessary elements of a nuisance, concluded that all plaintiffs (including the developers) were entitled to judgment against the county on the theory of inverse condemnation. Once that decision was made the parties stipulated to the various items of damage included in the judgments, the various judgments totaling $5,360,000.

The county's chief contention on appeal is that since the trial court's findings negated the possibility of a recovery on the grounds of negligence, nuisance or trespass, plaintiffs would have been unable to prevail had the defendant been a private individual whose actions were identical to those of the county herein; and that under prevailing authority there is no liability on the theory of inverse condemnation where, under the same facts, there would be no cause of action against a private individual.

This contention requires us to interpret article I, section 14, of the California Constitution, which provides: "Private property shall not be taken or damaged for public use without just compensation. . . ."

The county relies for a reversal on a rule of construction of the "or damaged" provision of this section of the Constitution first clearly enunciated by this court in *Archer* v. *City of Los Angeles*, 19 Cal.2d 19, 24 [119 P.2d 1]:[1]

"The provision permits an action against the state, which cannot be sued without its consent. It is designed not to create new causes of action, but to give a remedy for a cause of action that would otherwise exist. The state is therefore not liable under this provision for an injury that is *damnum absque injuria*. If the property owner would have no cause of action were a private person to inflict the damage, he can have no claim for compensation from the state. [Citations.[2]] In the present case, therefore, plaintiffs have no right to compensation under article I, section 14, if the injury is one that a private party would have the right to inflict without incurring liability."

This rule of construction of the "or damaged" provision has since been restated by this court in the following cases: *Clement* v. *State Reclamation Board*, 35 Cal.2d 628, 636 [226

---

[1] In *Brown* v. *Board of Supervisors*, 124 Cal. 274, 281 [57 P. 82], cited by the county, the court said: "The provision in the constitution invoked by them was inserted therein to provide for instances in which property was not taken from the possession of the owner, or into physical occupancy by the public, and applies only to such damages as may be recoverable under established rules of law. The damage which the appellants may sustain by reason of a diminution in value of their lands is not damage for which they are entitled to compensation."

The damages claimed in *Brown* were for narrowing the street without any physical damage to plaintiff's abutting property or interference with his access thereto, and not compensable under *Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614, 617 [37 P. 750, 42 Am.St.Rep. 149]; cf. *People* v. *Symons*, 54 Cal.2d 855, 858-859 [9 Cal.Rptr. 363, 357 P.2d 451].

[2] The California cases cited in support of this statement are discussed hereafter.

P.2d 897]; *Bauer* v. *County of Ventura,* 45 Cal.2d 276, 283 [289 P.2d 1]; *People* v. *Symons, supra,* 54 Cal.2d 855, 862; *Youngblood* v. *Los Angeles County Flood Control Dist.,* 56 Cal.2d 603, 608 [15 Cal.Rptr. 904, 364 P.2d 840]; and by Traynor, J., concurring in *House* v. *Los Angeles County Flood Control Dist.,* 25 Cal.2d 384, 393, 394 [153 P.2d 950], and dissenting in *Bacich* v. *Board of Control,* 23 Cal.2d 343, 366, 376 [144 P.2d 818].

The successful plaintiffs, as did the trial judge, rely upon a rule stated in the first case in our Supreme Court to construe the words "or damaged" after they were placed in the Constitution of 1879, *Reardon* v. *City & County of San Francisco,* 66 Cal. 492, 505 [6 P. 317, 56 Am.St.Rep. 109], where it was said:

"We are of the opinion that the right assured to the owner by this provision of the constitution is not restricted to the case where he is entitled to recover as for a tort at common law. If he is consequently damaged by the work done, whether it is done carefully and with skill or not, he is still entitled to compensation for such damage under this provision. This provision was intended to assure compensation to the owner, as well where the damage is directly inflicted, or inflicted by want of care and skill, as where the damages are consequential, and for which damages he had no right of recovery at the common law."

The *Reardon* case has been frequently cited and the above language sometimes quoted by this court and the District Courts of Appeal through the intervening years.

In *Tyler* v. *Tehama County,* 109 Cal. 618 [42 P. 240], this court reversed a judgment for defendant entered after sustaining a demurrer to the amended complaint. The complaint alleged that the county had constructed a bridge over Elder Creek and "that the abutments or walls supporting the new bridge confined the waters during freshets and turned the current against the south bank of the stream near . . . [plaintiff's] house, and caused it to cut away the bank, and that, if continued, it will destroy his house and much valuable land." (P. 620.) The court held that the complaint stated a cause of action under the "or damaged" provision of the Constitution of 1879, distinguishing the case of *Crowell* v. *Sonoma County,* 25 Cal. 313, a case similar on its facts, on the ground that *Crowell* was decided before the "or damaged" provision was inserted in the 1879 Constitution. (Pp. 621-622.) The court relied heavily on *Reardon* and held that since plaintiff

alleged that his property was directly damaged by the operation of the bridge as constructed the complaint stated a cause of action.

Of particular interest is the unanimous opinion of this court in denying a hearing in *Tormey* v. *Anderson-Cottonwood Irr. Dist.*, 53 Cal.App. 559, 568 [200 P. 814]: "In so far as the opinion of the district court of appeal appears to indicate that the plaintiffs cannot recover damages for the injury to their land unless it appears that the flooding thereof which caused the injury was the proximate result of the negligence of the defendant in the construction and maintenance of its canal, we disapprove the same. The canal is constructed for public purposes and to serve the purpose of distribution of water to public use. Apparently the damage to the plaintiffs is caused directly by seepage of water carried in said canal through the intervening soil on to the adjoining land of the plaintiffs. . . . In such cases the care that may be taken in the construction of the public improvement which causes the damage is wholly immaterial to the right of the plaintiff to recover damage, if the improvement causes it. This was expressly decided in *Reardon* v. *City & County of San Francisco*, 66 Cal. 505, [6 P. 317, 56 Am.Rep. 109], . . ."

In *Clement* v. *State Reclamation Board, supra,* 35 Cal.2d 628, 641, this court said: "The construction of the public improvement is a deliberate action of the state or its agency in furtherance of public purposes. If private property is damaged thereby the state or its agency must compensate the owner therefor [citations], whether the damage was intentional or the result of negligence on the part of the governmental agency." (Citing *inter alia Reardon* v. *City & County of San Francisco, supra,* and *Hooker* v. *Farmers' Irr. Dist.*, 272 F. 600.) In *Hooker* the court said (p. 603): "If, on the other hand, the defendant has inflicted damage upon the property of the plaintiff that is the necessary effect of its permanent maintenance and operation of this canal in a lawful and careful manner, which the state has authorized it to do for the public use, it is liable to pay this damage to the plaintiff because the infliction of such damage without compensation is a violation of the constitutional prohibition against the taking or damaging of private property for public use without just compensation therefor."

In *Powers Farms, Inc.* v. *Consolidated Irr. Dist.*, 19 Cal. 2d 123, 126 [119 P.2d 717], this court said: "It is well settled that damage to land caused, with or without negligence, by

the seepage of water from canals of an irrigation district which have been constructed and are maintained to supply water for public use, gives the owner of such land a cause of action in the nature of eminent domain against the district.''

The following quotations from recognized text writers are entitled to mention:

''A definition of 'damage,' which for a time had considerable support, was that it included such injuries and only such injuries as would be actionable at common law if inflicted without statutory authority. This definition of damage was the one adopted in England, and a strong argument in its favor was the fact that the evil against which the 'damage clause' was thought to be directed was the principle under which an act, which if done by an individual would be actionable, was held to be *damnum absque injuria* when committed by authority of law in the course of the construction of a public improvement. There can be no doubt that the 'damage clause' was intended to abrogate this principle, but to lay down the rule that damage in the constitutional sense is such injury and such injury only as would be actionable if done by a private individual neither clarifies the situation nor gives the clause a broad enough meaning to include the specific form of injustice which it was chiefly intended to remedy. . . .

''Common law liability is undoubtedly an indication of damage; but lack of liability at common law should not conclusively prove that there is no damage under the constitutional provision. Accordingly, courts are inclined to allow compensation for actual physical injury to land regardless of the fact that it was actionable at common law, and in case of injury to abutting property arising from a particular use of the street in front of it to disregard the test of common law liability altogether.'' (2 Nichols on Eminent Domain (3d ed. 1963) § 6.441[2], pp. 492-494.)

''Damage has been defined as injury to adjacent land caused by an act in the course of the construction of a public improvement which, if done by a private individual, would give rise to an action at common law. This apparently just and simple rule is subject to the objection that it does not include some forms of damage which it was the principal aim of the constitutional amendments to reach, as, for example, the change of grade of a street, but, although it has not been carried out to its logical end, this rule has frequently been proclaimed

by the courts of some jurisdictions as the true one. The purpose of the constitutional amendment, it is said, was not to change the substantive law of damages, or to enlarge the definition of that term. It was, rather, the purpose to make the law of damages uniform, so that a property owner may recover against persons or corporations having power of eminent domain under the same circumstances that would have authorized recovery against one not armed with that power. In cases of special and peculiar damage arising out of physical injury to property, courts are inclined to allow compensation although the injury is one that would not be actionable at common law if inflicted by an adjoining owner. In cases arising out of injury to abutting property by alterations or erections in a street, the question whether a private owner might lawfully make similar alterations or erections on his own land without liability to his neighbors is never even considered.

". . . As to what constitutes 'damage' within the meaning of constitutional guaranties, the rule which has received the most support in actual application is that compensation is required not only when there is an injury that would be actionable at common law, but also in all cases in which it appears that there has been some physical disturbance of a right, either public or private, which the owner of a parcel of land enjoys in connection with his property and which gives to it an additional value, and that by reason of such disturbance he has sustained a special damage with respect to his property in excess of that sustained by the public generally. Any definite physical injury to land or an invasion of it cognizable to the senses, depreciating its market value, is a damage in the constitutional sense, regardless of whether it is such an injury as a neighboring owner might inflict without liability at common law." (18 Am.Jur., Eminent Domain, §§ 138, 139, pp. 764-766.)

The two rules are not necessarily inconsistent. In the first place, in several of the main cases relied on by the county the rule was stated much more broadly than required by the facts. Thus in *Archer, supra,* the court held that a private riparian owner would have had a *right* to collect the surface waters on his land and channel them into the stream into which they would naturally drain even though this resulted in the flooding of lower lands. Based on this fundamental premise, the court was not required to go further than to hold that article I, section 14, did not require the state to

pay for damage which it had a *right* at common law to cause. The court made this clear at pages 25-26 of 19 Cal.2d where it said: "They cannot be held negligent for doing what they had a right to do even though a different plan might have avoided the damage." But the court announced the broader rule: "If the property owner would have no cause of action were a private person to inflict the damage, he can have no claim for compensation from the state." (19 Cal.2d p. 24.)

Two California cases are cited in support of this statement: *Lamb* v. *Reclamation Dist. No. 108,* 73 Cal. 125, 129-131 [14 P. 625, 2 Am.St.Rep. 775]; and *San Gabriel Valley Country Club* v. *County of Los Angeles,* 182 Cal. 392 [188 P. 554, 9 A.L.R. 1200]. The *Lamb* case dealt with damage caused by overflowing of plaintiff's land caused by a levee completed in 1872. (73 Cal. pp. 127-128.) It therefore was not concerned with the construction of the "or damaged" clause of the Constitution of 1879. The only question was whether there was any "taking" (see pp. 132-133).

The *San Gabriel* case was, like *Archer,* a case of surface waters being drained into a natural watercourse into which they would normally have flowed. After an extensive discussion of the common-law right of an upper riparian owner to do this, the court summarily disposed of the constitutional claim by citing *Gray* v. *Reclamation District No. 1500,* 174 Cal. 622 [163 P. 1204]. (182 Cal. p. 406.) *Gray* was a case disposed of on the theory that the damage complained of was caused by a proper exercise of the police power and therefore, *damnum absque injuria,* not covered by the protection of the "or damaged" provision of article I, section 14. Neither case on its facts suggests, except by the use of the catchall phrase "*damnum absque injuria,*" that under no circumstances could a landowner recover for damage inflicted by the state under the "or damaged" clause unless on the same facts a cause of action would exist against a private party. It should be noted that *Gray* was decided in 1917, and, in 1921, in denying a hearing in *Tormey, supra,* 53 Cal.App. 559, the court went out of its way to reaffirm the rule of *Reardon.*

■ From the foregoing analysis of the cases and other legal authorities it is apparent that we are not required to choose between two absolute rules, one of liability and one of nonliability, but are faced with a more limited issue. The question is not whether in all cases, a property owner should not be permitted to recover in an inverse condemnation action

if a private party would not be liable for damages similarly inflicted,[3] but whether there is or should be a qualification or limitation of that rule to the effect that the property owner may recover in such an action where actual physical damage is proximately caused to his property by a public improvement as deliberately planned and built, whether such damage is foreseeable or not.

To restate the question: The issue is how should this court, as a matter of interpretation and policy, construe article I, section 14, of the Constitution in its application to any case where actual physical damage is proximately caused to real property, neither intentionally nor negligently, but is the proximate result of the construction of a public work deliberately planned and carried out by the public agency, where if the damage had been foreseen it would render the public agency liable?

This somewhat limited statement of the question serves to explain several of the most important cases relied on by the county. The qualification in the question "where if the damage had been foreseen" takes care of the cases like *Archer, supra,* 19 Cal.2d 19, where the state at common law as an upper riparian proprietor had the *right* to inflict the damage; and like *Gray, supra,* 174 Cal. 622, where the court held the damage noncompensable because inflicted in the proper exercise of the police power. Such cases as *People* v. *Symons, supra,* 54 Cal.2d 855, involving loss of business and diminution of value by diversion of traffic, circuity of travel, etc., do not involve direct physical damage to real property, but only diminution in its enjoyment. The court in *Reardon, supra,* clearly differentiated actual physical damage, saying: "Here the damage is to the houses affixed to the land. This is special damage to the plaintiffs, for which they are entitled to recover, though they may be of the class usually styled consequential." (66 Cal. p. 506.)

This court in considering a similar policy question in *Clement* v. *State Reclamation Board, supra,* said at 35 Cal.2d 628, 642: "The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking." In

---

[3] It is assumed in this statement of the question that a private party would not be liable under the circumstances here involved. It should be mentioned that plaintiffs argue that, under the court's findings, liability would exist against a private party, on several different grounds, under the facts here involved. Because of the conclusion we have reached it will not be necessary to discuss these contentions.

the concurring opinion of Traynor, J., in *House* v. *Los Angeles County Flood Control Dist., supra,* 25 Cal.2d 384, 397, the same statement is followed by the language: "It is irrelevant whether or not the injury to the property is accompanied by a corresponding benefit to the public purpose to which the improvement is dedicated, since the measure of liability is not the benefit derived from the property but the loss to the owner."

The competing principles are stated in *Bacich* v. *Board of Control, supra,* 23 Cal.2d 343, 350: "It may be suggested that on the one hand the policy underlying the eminent domain provision in the Constitution is to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements. . . . On the other hand, fears have been expressed that compensation allowed too liberally will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost."

The following factors are important. First, the damage to this property, if reasonably foreseeable, would have entitled the property owners to compensation. Second, the likelihood of public works not being engaged in because of unseen and unforeseeable possible direct physical damage to real property is remote. Third, the property owners did suffer direct physical damage to their properties as the proximate result of the work as deliberately planned and carried out. Fourth, the cost of such damage can better be absorbed, and with infinitely less hardship, by the taxpayers as a whole than by the owners of the individual parcels damaged. Fifth, to requote *Clement, supra,* 35 Cal.2d page 642, "the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking."

This court said in *Bacich, supra,* 23 Cal.2d page 351, quoting from Sedgwick on Constitutional Law: " 'The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property which it destroys or impairs the value, as well as for what it physically takes. . . .' "

For these reasons we conclude that in the appeal of the county the judgments should be affirmed on the ground that with the exceptions stated in *Gray, supra,* and *Archer, supra,* any actual physical injury to real property proximately caused by the improvement as deliberately designed and con-

structed is compensable under article I, section 14, of our Constitution whether foreseeable or not.

This conclusion makes it unnecessary to consider the various other points urged by plaintiffs for an affirmance of the judgments.

Other questions involved were adequately and ably disposed of by the District Court of Appeal when these appeals were pending there. We adopt as part of the opinion of this court the following portions of the appellate court opinion written by the Honorable Turney Fox (Cal.App.) 38 Cal.Rptr. 308, 317 et seq.:

"The county also contends that the companies are barred from recovery due to an estoppel arising from deeds to the county conveying the right of way for the boulevard and from the companies' consent to the placement of the fills. Regarding this aspect the trial court found: 'In January, 1950, Palos Verdes Corporation granted, without consideration and the County accepted, an 80 ft. right of way for the construction of Crenshaw Boulevard. Subsequent to the delivery of the Deed for said right of way, Palos Verdes Corporation consented to and approved the extension of cuts and fills outside the dedicated right of way where necessary for road purposes, and consented to and approved such realignments as were made by the County including the realignment of Curve 3.

" 'Construction of Crenshaw Boulevard was commenced by the County in June of 1950. The construction of this highway included the making of extensive cuts and the deposition of substantial quantities of fill material, both within and without the deeded or realigned right of way. Between July 1, 1955 and August 20, 1956 the County excavated material from locations outside the present active slide area and transported and deposited this material within the present slide area. This material included 72,000 yards required for road fill and slopes, and 66,000 yards of waste material. In addition to these quantities, there was also placed within the initial active slide area approximately 37,000 yards of waste material, substantially all of which was cut from within the present active landslide area but outside the initial active slide area. [These figures comprise the total of 175,000 cubic yards of dirt and waste material referred to in footnote 1.] The placement of the above-mentioned waste material by the County within the initial slide area was done with the consent and approval of the Palos Verdes Properties.'

"To what extent then does such consent and approval affect the application of section 14 of article I of the Constitution?

■ The county cites Civil Code section 1589 that 'A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.' The foregoing section makes applicable to contracts the equitable rule of Civil Code section 3521 that: 'He who takes the benefit must bear the burden.' Section 1589 itself limits consent to obligations by acceptance of benefits to such obligations as arise from the transaction 'so far as the facts are known, or ought to be known, to the person accepting.' ■ While it may well be true that the Companies, by consenting to the fills, would be estopped to claim the inverse condemnation damages reasonably to be anticipated by such fills, it does not appear that they are estopped as to damages which neither they, nor the county, nor any reasonable person would have foreseen.

■ "The rule of estoppel by deed in the public taking of land is set forth in the frequently quoted case of *Sternes* v. *Sutter Butte Canal Co.,* 61 Cal.App. 737, at page 743 [216 P. 66], as follows: 'It thus appears by an unbroken line of authorities, and also as well as by good reasoning, that whenever a grant of a right of way is executed by a land owner he thereby estops himself from afterward prosecuting any action for the past, present, or future damages that may have occurred, or *reasonably be expected to occur,* by reason of the necessary, natural, and ordinary use of the utility or public service for which the right of way is granted.' (Italics added.)

"The same rule applies to a taking by consent. In *Sutro Heights Land Co.* v. *Merced Irr. Dist.,* 211 Cal. 670, the Supreme Court, referring to the *Sternes* case, says at pages 692-693 [296 P. 1088]: 'We think the same rule would apply when instead of a grant deed the land owner expressly agreed to the taking of his property for public use. In case private property has been taken by condemnation the rule is that the owner has received in said proceeding all damages to his property *which would be the natural, necessary and reasonable incident to the taking thereof for public use.* In case he has given his consent to such taking by deed, he is precluded from subsequently recovering any damage that he might have recovered in an action had the public use been taken by condemnation. (*Sternes* v. *Sutter Butte Canal Co., supra.*)

We think the same rule applies where the private owner has, as the plaintiffs in this case have, expressly consented to the taking of their property for a public use. Particularly should this be so when, as in the instant case, the private owners have not only acquiesced and consented but have importuned and demanded the construction of the public improvement upon their property.' (Italics added.) The *Sutro* case involved canal seepage which the trial court found was usual and unavoidable and which the Supreme Court said was 'but the natural, necessary and reasonable incident to the use and operation of said canal.' ▮ Hence we cannot say that the companies in accepting such benefit as accrued to them through the construction of Crenshaw Boulevard and the making of the fills consented to the damage of their land which was not a 'natural, necessary and reasonable incident' to the construction of the road and the making of the fills. . . . [T]he damage here suffered was of the latter category, . . .

''In addition, the trial court found that 'Companies are not estopped from claiming damages caused by County's road construction activities of Crenshaw Boulevard by deeds or easements or rights of way granted to County by Developers, Palos Verdes Corporation, or any of them.' In an appeal upon the clerk's transcript only, such as the county has brought, it is impossible for us to say as a matter of law that this finding does not have adequate evidentiary support. ▮ The rule is well established that the existence of an estoppel is generally a question of fact for the trier of fact, and ordinarily the trial court's determination is binding on appeal unless the contrary conclusion is the only one to be reasonably drawn from the facts. (*Henry* v. *City of Los Angeles*, 201 Cal.App.2d 299, 306 [20 Cal.Rptr. 440]; *People* v. *Watkins*, 175 Cal.App.2d 182, 185 [345 P.2d 960].) We find no justification in the record for upsetting the above quoted findings. . . .

''The Palos Verdes Water Company (referred to hereinafter as the Water Company) has appealed from that portion of the judgment which denied it recovery for the cost of installing surface waterlines to replace its underground system. ▮ ''The Water Company is a public utility providing water service to the area involved in the landslide. The underground waterlines owned by the Water Company were progressively destroyed by the landslide and thereafter abandoned. The trial court found that the fair market value of the portion of the water system which was destroyed was

$67,260, and that certain other waterlines having a fair market value of $8,052 were rendered useless by the slide. It was also found that plaintiff had expended $19,430.44 for extraordinary expenses in repair and maintenance of the water system during the period of its gradual destruction. In addition, interest was awarded from June 1, 1957, the median date of abandonment of the system. The total judgment entered in favor of the Water Company upon these findings was $135,810. In view of our earlier determination that the county is liable for the damage proximately caused by the landslide, it follows that this award in favor of the Water Company must stand.

"In addition, the Water Company seeks recovery of $48,918.05 which the trial court found was expended by the company to install a surface water system. The finding of the court as to this item of expense is as follows: '71. As the water distribution system in the present active landslide area referred to in Finding 68 of plaintiff Palos Verdes Water Company was progressively destroyed and abandoned, said plaintiff between November 30, 1956 and September 30, 1960, installed a surface line water distribution system, thereby relocating and replacing the destroyed and abandoned portion of its system, at a cost to said plaintiff of $48,918.05, with a median date for said expenditures of April 1, 1957.

" 'Palos Verdes Water Company believed, in good faith, that it was necessary to continue providing water to the residents who lived within the present active landslide area after the water distribution system referred to in Finding 68 was destroyed and abandoned.

" 'Said plaintiff did not have a duty as a public utility to install and relocate, by way of a surface distribution system, the water distribution system referred to in Finding 68 after said water distribution system was destroyed and abandoned.'

"The Water Company contends that recovery of this amount is authorized by Code of Civil Procedure section 1248, subdivision 6, which provides: 'If the removal, alteration or relocation of structures or improvements is sought, the cost of such removal, alteration or relocation and the damages, if any, which will accrue by reason thereof' must be determined in an eminent domain proceeding. No case is cited by the Water Company, however, and we have been unable to find one that allows recovery for the relocation of an improvement in addition to full compensation for the damaged or destroyed improvement. Judgment having been given for the fair market

value of the water system (plus additional damages as previously noted), it would constitute double recovery to allow in addition the cost of constructing a substitute water system. Plainly, the code section does not contemplate such a result. The fallacy in the Water Company's argument can be illustrated by an automobile accident in which the innocent owner's car is destroyed. In such a case the owner would not be entitled to recover the value of his destroyed car and, in addition, the cost of a replacement. We are satisfied that the trial court properly disallowed the Water Company's claim for additional damages.''

■ Plaintiffs, Rancho Palos Verdes Corporation and Capital Company, copartners doing business under the name of Palos Verdes Properties, have appealed from that portion of the judgment which denied them recovery for expenditures they made in attempting to determine the cause of the landslide and to prevent or minimize further damage. The amount of these expenditures was approximately $283,225, which the trial court found to be reasonable and to have been expended in good faith.[4]

The trial court awarded these plaintiffs the difference between the fair market value of their property before the landslide and the fair market value of the property subsequent

---

[4]The relevant findings recite: ''66. Soon after the present active landslide commenced and prior to August 1, 1957, plaintiff Palos Verdes Properties expended an amount of $198,411.37, consisting of the following approximate sums: $33,000.00 for the employment of expert geologists, soils analysts and foundation engineers; $34,000.00 for survey and measurements of the landslide; $78,000.00 for the drilling of test holes to determine the depth and character of the slip plane of said landslide; and $53,000.00 in a joint effort with defendant County for the construction of 25 shear-pin caissons. All of the aforesaid sums were reasonable in amount and expended in good faith by Palos Verdes Properties to ascertain the cause of the present active landslide for the purpose of stopping it. Had these efforts and the joint effort with the County by said plaintiff been successful as reasonably expected when the said expenditures were made, the amount of damage resulting to said plaintiff's property and to the properties of other landowners and home owners in the active landslide area would have been substantially less than as found in these findings of fact.

''67. Between October of 1959 and March of 1960, Palos Verdes Properties placed a rock revetment at the toe of the present active landslide to prevent erosion of the mass of earth which was moving into the ocean, at a cost to said plaintiff in the amount of $84,814.00. The purpose of the revetment was to expedite stoppage of the active landslide and also to decrease the risk of further extension of the present active landslide. The said cost of the revetment was reasonable in amount and was expended by said plaintiff in good faith. Had ocean erosion of the toe of the landslide been permitted to occur, the risk of additional landslide damage and injury to property outside the existing perimeter of the present active landslide would, at the time the revetment was constructed, have been substantially greater.''

to the slide, together with severance damages to adjoining property. These plaintiffs are seeking recovery of the above mentioned expenditures as a separate and additional item of damage resulting from the landslide.

There is respectable authority for allowing these proven expenses to enter into the computation of the ''just compensation'' due to plaintiffs under article I, section 14, of our Constitution.

Two premises suggest themselves at the outset of a discussion of this item of damage. First, neither the relevant constitutional nor statutory provisions expressly forbid the type of recovery here sought. Phrased in such broad terms as ''just compensation'' (Cal. Const., art. I, § 14) and ''value of the property'' (Code Civ. Proc., §§ 1248, 1249), these enactments serve primarily as points of departure for a case-by-case development of the law governing recovery for direct and inverse condemnation in this state. (*People* v. *Ricciardi* (1943) 23 Cal.2d 390, 395-396 [144 P.2d 799].) Secondly, as conceded by all parties, no California case has been found holding the principle of mitigation of damages to be applicable in a condemnation proceeding. But this does not mean that no such principle can apply; it simply means that the matter has not yet been expressly decided by our appellate courts.

In the absence of California authority on a point of eminent domain law this court has often turned to the decisions of our sister states having similar constitutional or statutory provisions. (*Citizens Utilities Co.* v. *Superior Court* (1963) 59 Cal.2d 805, 817 [31 Cal.Rptr. 316, 382 P.2d 356]; *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 353 [144 P.2d 818]; *Rose* v. *State of California* (1942) 19 Cal.2d 713, 740-741 [123 P.2d 505].) On the issue now before us the general rule is that an owner whose property is being taken or damaged by a public entity is under a duty to take all reasonable steps available to minimize his loss. (18 Am.Jur., Eminent Domain, § 262, p. 903; 29 C.J.S., Eminent Domain, § 155, p. 1015, n. 69; 4 Nichols on Eminent Domain (3d ed. 1962) § 14.22, p. 525.) With apparently the sole exception of Iowa (*Wilson* v. *Fleming* (1948) 239 Iowa 718 [31 N.W.2d 393, 398-399]) the cases are uniform in upholding this requirement. (See, e.g., *United States* v. *First Nat. Bank* (D.C. M.D. Ala. 1918) 250 F. 299, 302; *State* v. *Pahl* (1959) 254 Minn. 349 [95 N.W.2d 85, 91]; *Town of Cape Charles* v. *Ballard Bros. Fish Co.* (1959) 200 Va. 667 [107 S.E.2d 436, 440];

*City & County of Denver* v. *Noble* (1951) 124 Colo. 392 [237 P.2d 637, 639]; *American Woolen Co.* v. *State* (1925) 125 Misc. 186 [211 N.Y.S. 149, 169].) As a corollary, it is likewise generally held that expenses which the owner reasonably and in good faith incurs in an effort to minimize his loss are to be taken into account in computing the "just compensation" awarded to him in a proceeding in eminent domain. (29 C.J.S., Eminent Domain, § 164, pp. 1035-1036; 25 C.J.S., Damages, § 49, p. 531; 4 Nichols on Eminent Domain (3d ed. 1962) § 14.22, pp. 526-528.)

Thus in *Kane* v. *City of Chicago* (1945) 392 Ill. 172 [64 N.E.2d 506, 509], an action in inverse condemnation was brought to recover for structural damage to a building caused by the city's construction of a bridge on the adjacent street. Noting that the Illinois Constitution provides (as does ours) that "private property shall not be taken or damaged for public use without just compensation," Chief Justice Thompson, speaking for the Supreme Court of Illinois, stated that "The measure of damages is the depreciation in the market value of the property as a whole, caused by a direct physical disturbance of some right incident to its ownership. [Citations.] . . . Structural injury to a building is an element proper to be considered in ascertaining what damages are sustained by the property. [Citation.] *Expenses reasonably and prudently incurred in good faith in making a proper effort to prevent or diminish injury to the building are considered a diminution of the fair cash market value of the real estate, and as such are proper items to be recovered.* [Citations.] Where expenses have been so incurred, an instruction declaring the difference in market value to be the measure of damages, but omitting any reference to such expenses as a part of the damages, is properly refused. [Citation.] " (Italics added.)

The rule is similar in New York. In *Zidel* v. *State* (Ct. Cl. 1949) 198 Misc. 91 [96 N.Y.S.2d 330, 337], an action in the nature of inverse condemnation was brought to recover for erosion damage caused when state engineers placed large concrete slabs in the bed of a creek for the purpose of supporting reconstruction work on an adjacent highway, thereby obstructing the natural flow of the creek and directing it against the claimant's land. In an effort to protect his property from such erosion the claimant built a wooden retaining wall along the creek bank as it then existed, and filled the space behind the wall with dirt. The New York Court of Claims denied the State's motion to strike out testimony as to

the cost of the latter wall, reasoning as follows: "In erecting the temporary retaining wall claimant was within the principle laid down by the Courts that 'The rule is of general and widespread application that one who has been injured either in his person or his property by the wrongful act or default of another is under an obligatory duty to make a reasonable effort to minimize the damages liable to result from such injury, and that if he does not make such reasonable effort he will be debarred from recovering for those additional damages which result from such failure . . . ' [citation] and that 'it is held as a natural corollary to this rule of duty, not only that the injured party who makes a successful effort to avoid or reduce damages will be allowed to recover the expenses necessarily incurred in so doing, but also that *he will be allowed to recover the expenses of a proper effort even though it proves unsuccessful.* The scope of the effort and the limit upon the expenses for which he may recover, especially in the latter case, are naturally defined by different words in different cases. But from them all we think the general rule may be fairly deduced that the effort must be made in good faith; that it must be conducted with reasonable skill, prudence, and efficiency; that it must be reasonably warranted by and proportioned to the injury and consequences to be averted; and that it must be made under a belief reasonably justified that it will avoid or reduce the damages otherwise to be apprehended from the wrong complained of.' [Citation.] Therefore, for the foregoing reasons we are of the opinion that claimant is entitled to recover for the reasonable cost of erecting the temporary wall, and in our accompanying decision we are making an award in that amount." (Italics added.)

In varying contexts this rule has been invoked in a substantial number of jurisdictions. (See, e.g., *United States* v. *Dickinson* (1947) 331 U.S. 745, 751 [67 S.Ct. 1382, 91 L.Ed. 1789]; *State* v. *Snider* (1948) 131 W.Va. 650 [49 S.E.2d 853]; *Town of Oneida* v. *Hail* (1937) 21 Tenn. App. 70 [105 S.W.2d 121, 122]; *Bishop* v. *City of Meriden* (1932) 115 Conn. 624 [159 A. 289]; *Berg* v. *Village of Chisholm* (1919) 143 Minn. 267 [173 N.W. 423]; *Brooklyn Trust Co.* v. *City of New York* (1919) 109 Misc. 593 [179 N.Y.S. 441]; *King County* v. *Seattle Cedar Lumber Mfg. Co.* (1916) 94 Wash. 84 [162 P. 27, 30-31, L.R.A. 1917C 1184]; *City of Lexington* v. *Chenault* (1913) 151 Ky. 774 [152 S.W. 939, 941, 44 L.R.A. N.S. 301]; *Cromer* v. *City of Logansport* (1906) 38 Ind.App. 661 [78

N.E. 1045, 1048] (''Where the performance of the injured party of such duty of cutting down the damages involves labor or expense, the party responsible for the injury is chargeable with such reasonable cost'').)

No reason appears why the rule in California should be harsher than that of our sister states. No overriding public policy demands that in eminent domain proceedings in California the owner of property be denied recovery for expenses reasonably and in good faith incurred in an effort to minimize his loss.[5] On the contrary, it would seem that the public interest would be served by allowing the possibility of such a recovery: the owner, who is ordinarily in the best position to learn of and guard against danger to his property, would thereby be encouraged to attempt to minimize the loss inflicted on him by the condemnation, rather than simply to sit idly by and watch otherwise avoidable damages accumulate. To the extent that the loss is minimized, of course, the amount of the public entity's liability to the owner is reduced; and adequate protection for the public entity would seem to be provided by the requirements of good faith and reasonableness (see *Zidel* v. *State* (Ct. Cl. 1949) *supra*, 96 N.Y.S.2d 330, 337).

Here those requirements are amply fulfilled by the trial court's finding, commendably made in view of its denial of recovery, that the sums in issue ''were reasonable in amount and expended in good faith'' for the purpose of mitigating the losses inflicted by the slide. That the efforts to prevent further damage failed is irrelevant; indeed, it must be inferred that by voluntarily joining with Palos Verdes Properties in constructing the 25 shearpin caissons the defendant county concurred in the engineering judgment that there existed at that time a substantial likelihood of stopping the slide. The important fact, as further found by the trial court, is that if such efforts had been successful the amount of damage inflicted by the slide ''would have been substantially less'' than that which ultimately occurred. The latter finding brings these expenses within the settled rule that in determining what is ''just compensation'' in an eminent domain proceeding ''it is only the value of, and the damage to, the property itself, which may

---

[5]That such recovery is not per se violative of public policy is shown by the fact that in cases of tortious injury to property the owner is admittedly under a duty to exercise reasonable care and diligence to minimize the resulting damages (*Jordan* v. *Talbot* (1961) 55 Cal.2d 597, 610-611 [12 Cal.Rptr. 488, 361 P.2d 20]), and that reasonable expenses incurred in discharging such duty are recoverable (*Kleinclaus* v. *Marin Realty Co.* (1949) 94 Cal.App.2d 733, 739 [211 P.2d 582]).

be considered.'' (*People* v. *Ricciardi* (1943) *supra,* 23 Cal.2d 390, 396.)

The trial court denied recovery, however, on the theory that expenditures to mitigate damages after the slide was discovered ''obviously did not increase the value of plaintiffs' land before the slide commenced.'' This is true, but it misses the point. ■■■ If, in accordance with the general rule and the dictates of public policy, the duty to mitigate damages is held to apply in eminent domain cases, the fair market value of the property taken or damaged will be *decreased* by the amount which the owners reasonably and in good faith spend in discharging that duty. Such amount can usually be determined with precision, as it was in the case before us. It is therefore unnecessary to draw a technical distinction between designating this amount as a separate item of damages or merely placing it on the debit side in computing the fair market value of the property after the taking; in either event the result will be the same.

■■■ Plaintiffs filed notices of appeal from the judgments, specified that they intended to attack the findings of the court negativing the county's negligence and the lack of foreseeability of the damage which occurred, and asked for the preparation of a partial reporter's transcript, all in accordance with rule 4(b), California Rules of Court. The county failed to designate any other part of the oral proceedings for inclusion in the transcript as authorized by rule 4(b). As a result the testimony relied upon by the trial court in support of its findings of lack of negligence and forseeability (see memorandum opinion of the trial court) does not appear in the partial transcript.

This presents the question as to whether a successful party can appeal from a judgment in his favor solely to attack findings of the court, which if he is successful would result in new findings being made or ordered which would themselves support the judgment, if the original findings should be held by the court on appeal to be insufficient to support it. Code of Civil Procedure section 938 provides for an appeal by ''any party aggrieved.'' It has consistently been held that a party cannot appeal from a judgment in his favor because he is not a ''party aggrieved.'' (3 Cal.Jur.2d 568, and cases cited in fn. 11; *Coburg Oil Co.* v. *Russell,* 100 Cal.App.2d 200, 204 [223 P.2d 305] ; *Estate of Hughes,* 80 Cal.App.2d 550, 554-555 [182 P.2d 253].) Under this rule these appeals must be, and they are, dismissed.

 We order a limited reversal in L.A. 27933 with directions to the trial court to enter a new judgment awarding to plaintiffs, Rancho Palos Verdes Corporation and Capital Company, additional damages in the amount of $198,411.37 with interest thereon at the rate of 7 per cent per annum from August 1, 1957, until the date of entry of judgment and additional damages in the amount of $84,814 with interest thereon from March 31, 1960, at the rate of 7 per cent per annum until the date of entry of judgment; with that exception, the judgments appealed from are affirmed. All parties shall bear their own costs on the appeals.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Mosk, J., concurred.

The petitions of the defendant and appellant in each case and of the plaintiffs and appellants in L.A. No. 27933 for a rehearing were denied February 17, 1965, and the opinion and judgment were modified to read as printed above.