[Civ. No. 26151. First Dist., Div. Two. Aug. 20, 1970.]

MARIA JACINTO SOUSA, Plaintiff and Respondent, v.
CATHERINE E. FREITAS et al., Defendants and Appellants.

## COUNSEL

Martin & Martin, Martin, Martin & Sanford, Martin, Martin & Ward, J. Robert Ward and Francis T. Cornish for Defendants and Appellants.

Bernal, Rigney & Kilbourne and George W. Kilbourne for Plaintiff and Respondent.

## OPINION

**DAVID, J.\*** — Plaintiff Maria Jacinto de Sousa, now some 82 years old, illiterate resident of Santo Espirito, on the island of Santa Maria, Azores, Republic of Portugal, was found by the trial court to be the lawful wife of Manuel Sousa Freitas at the time of his death. Hence, she was awarded a decree imposing a constructive trust as to her marital interest on

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

the properties of his estate, as against Catherine E. Freitas, found to be only his putative wife, and the Bank of America National Trust & Savings Association, as executor. The appellants contest such determinations.

Three years after his marriage at Santo Espirito in 1908 and establishing their residence there, followed by the birth of a son, Manuel Joaquin de Sousa emigrated to California, and for a short period remitted small sums to his family. In 1915, Sousa secured a decree from the Superior Court of Alameda County changing his name to Manuel S. Freitas. Though it would seem that a wife or a child is a person vitally concerned, the Code of Civil Procedure sections 1275-1279, inclusive, makes no provision for personal service of such an application upon them unless as a "near relative" when the father of a petitioner is not living (Code Civ. Proc., § 1276). Maria, his wife, did not know of this change of name until long after 1916.

In 1916, Manuel S. Freitas secured a divorce from Maria S. Freitas, meaning Maria Jacinto Sousa. Service was made by publication, the affidavit stating the defendant lived in "Santa Maria, in the Republic of Portugal," though Manuel well knew Santa Maria was only the island on which his wife lived in Santo Espirito at the home they occupied together; and that there, his wife was not and never had been known as Maria Sousa Freitas. There is evidence that he was not there known as Freitas, contrary to his declaration for change of name. Her testimony was that he was always known as Sousa there.[1]

Testifying in the trial court for appellants, Manuel's brother bore the

---

[1] In Spain, Portugal and in Latin-American countries, there is a custom whereby a child bears or may be known by the names of both father and mother, and the name of the mother, appearing last may be used as the family name; or is sometimes expressed only as an initial following the father's family name. Manuel Sousa was the son of Jose Joaquim de Sousa and Bernardina Jacinta de Freitas; and his cousin and wife Maria Jacinta de Sousa is the daughter of Manuel Joaquim de Sousa and Bernardina Jacinta de Chaves. Upon marriage, her surname (sire's name) remained Sousa; and although Freitas under the old custom might describe himself "Manuel Sousa de Freitas," the name Freitas still would not identify her in this island kingdom of cousins. On Santa Maria, there is testimony neither Manuel nor Maria was ever known by the name "Freitas." His brother testifying on the trial gave his surname as "Souza."

There were so many Maria Joaquin Sousas on Santa Maria—cousins bearing the same name—that Maria Sousa for better identity carried also her grandmother's name of Figueiredo. The son of Maria and Manuel Sousa, left with his mother when Manuel emigrated, also was called Jose Sousa Figueiredo.

It therefore seems inevitable that the identity of "Maria S. Freitas," without any designation of place of residence, whether town, locality or parish, on the island of Santa Maria, would be unknown. Thus whether by inadvertence or design, she was deprived of the notice that Code of Civil Procedure section 413 requires that "a copy of the summons and complaint to be forthwith deposited in the post office, directed to the person to be served, at his place of residence. . . ."

"Residence" in this connection means the address at which letters would be most likely to reach the defendant. (Cf. *San Diego Sav. Bank* v. *Goodsell* (1902) 137 Cal. 420, 427 [70 P. 299]; and consider Civ. Code, § 129.)

name of Sousa; and appellants' exhibits in the form of letters from the son of Manuel and Maria to his father show the complete home address as Azenka, Santo Espirito, Santa Maria, Portugal.

By reason of the name change and incomplete address the trial court is supported in the finding that Maria "had no notice or knowledge of said divorce action, was not served as a party to said action, and was not a party to the judgment for divorce rendered in 1919. No other action was taken by either plaintiff or her said husband to terminate their marriage, and at all times until the date of death of said decedent, plaintiff believed that she was the legal wife of decedent; said plaintiff, not having been served with process in the aforementioned divorce action, had no opportunity to impose any valid and meritorious defense to any cause of action for divorce which the decedent could or might have brought during his lifetime." ■ The basis for Manuel's action was her alleged refusal to come to him in America; her claim is, that he did not send for her, nor provide the funds. This was a sufficient meritorious defense. (*Bennett* v. *Hibernia Bank* (1956) 47 Cal.2d 540, 554 [305 P.2d 20].)

The trial court concluded that the plaintiff was not a party to nor bound by the change of name proceeding by her husband, and that the purported decree of divorce did not terminate her marriage because Manuel S. Freitas perpetrated extrinsic fraud on plaintiff by designating his defendant wife in the divorce proceedings as Maria S. Freitas. We have noted also the important variance in the address; but whether inadvertent or deliberate, the evidence would indicate that Maria might have received the summons had it been addressed in her proper name or in one which she recognized as her own or by which she was known in the community. (Cf. *Rivieccio* v. *Bothan* (1946) 27 Cal.2d 621, 624 [165 P.2d 677].)

The trial court necessarily concluded that the marriage ceremony between Manuel S. Freitas and Catherine E. Afflech was invalid.[2]

But from December 29, 1919 until Manuel's death on August 4, 1962, Catherine E. Freitas lived with him in good faith, believing she was lawfully married to him. All of the property held by him at his death was the product of their joint efforts. Maria was not named in Manuel's will, which devised and bequeathed all of his estate to Catherine.

Therefore, we review the determinations of the trial court, relative to the trust imposed upon the estate, securing the rights therein declared in favor of plaintiff Maria Sousa.

---

[2]We note that this marriage was on the day the divorce decree was signed, but on the day before it became effective by entry of judgment, no *nunc pro tunc* entry ever having been made; as well as the absence of valid service of summons and complaint on Maria Jacinto Sousa by publication.

These were (1) all of the property was community property of Manuel S. Freitas and Maria Jacinto Sousa, at the time of his death; (2) that as widow, Maria is the owner of an undivided one-half interest as a community interest in all of said real and personal property and income and proceeds thereof; (3) that as putative spouse Catherine is entitled to the other one-half of all such real and personal property with the proceeds and income thereof.

We are impelled to modify such findings and conclusions.

■ As against the other spouse or his heirs it is well settled that a woman who lives with a man as a wife in the belief a valid marriage exists is entitled to share in the property accumulated by them during its existence. The proportionate contribution of each is immaterial in this state, for the property is divided as community property would be upon dissolution of a valid marriage. (*Vallera* v. *Vallera* (1943) 21 Cal.2d 681, 683-684 [134 P.2d 761].)

The putative wife's share is not community property. But what is the situation when the legally recognized spouse steps forward to assert her community property interest in and to the same property, as against the putative spouse? There is scant authority. In *Union Bank & Trust Co.* v. *Gordon* (1953) 116 Cal.App.2d 681 [254 P.2d 644], the "legal" spouse was estopped to assert her claim, since she herself had remarried in reliance upon the invalid divorce. In *Estate of Ricci* (1962) 201 Cal.App.2d 146 [19 Cal.Rptr. 739], where decedent apparently made no disposition of his community interest by will, the award of one-half to each of the legal and the putative spouses was affirmed. (There, the putative wife appealed, claiming the entire estate was the result of her joint efforts with decedent.) This was an equity decision, in the teeth of Probate Code section 201 under which the legal wife would have inherited his portion. The trial court followed this precedent.

■ But here, the decedent already had by will vested his half of the community property in the defendant putative spouse, a valid disposition under Probate Code sections 201 and 201.5.

■ By definition, the one-half of the community property so devised was his; and did not include the other half to which the competing claims apply. Stated another way, in accordance with the views expressed by Professor William E. Burby in Family Law for California Lawyers, pages 359-360 (quoted in *Estate of Ricci, supra,* 201 Cal.App.2d 146, at pp. 148-149): " 'It seems obvious that one-half of the property in question be-

longs to the putative spouse. The other half belongs to the legal community (husband and legally recognized spouse) and should be distributed as any other community property under the same circumstances.' " Under this analysis by the recognized expert in community property law, Catherine is entitled to one-half of the property in her own right; plus the half of the community property decedent was entitled to devise, or another one-quarter of the whole; and the plaintiff is entitled to one-quarter of the whole estate only. (*Blache* v. *Blache* (1945) 69 Cal.App.2d 616, 624 [160 P.2d 136].) In effect, the innocent putative spouse was in partnership or a joint enterprise with her spouse, contributing her services—and in this case, her earnings—to the common enterprise. Thus, their accumulated property was held in effect in tenancy-in-common in equal shares. Upon death of the husband, only his half interest is considered as community property, to which the rights of the lawful spouse attach.[3] We do not undertake to state that this analysis would be equitable in all cases, but we are satisfied that it is under the facts here.[4]

The findings and conclusions are modified to state: (1) one-half of the property was community property of Manuel S. Freitas and Maria Jacinto Sousa, at the time of his death; and Maria Jacinto Freitas is the owner of an undivided one-fourth interest as a community interest in all of said real and personal property and income and proceeds thereof; (2) that as a putative spouse, Catherine is entitled to one-half of all such real and personal property and income and proceeds thereof; and as legatee and devisee of the deceased to an additional one-fourth thereof, being his disposition of his half interest in the community property, under Probate Code, sections 201 and 201.5.

Having carefully read and considered the record, we hold that in all

---

[3]Various analogies have been drawn to characterize the nature of the property acquired during the putative marriage to protect the innocent de facto spouse. Consult: W. Q. de Funiak, Principles of Community Property (1943) pages 124-132, section 56; Family Law for California Lawyers (1956) *supra*, chapter 13, William E. Burby, "Significant Aspects of Community Property Law," sections 5, 6, pages 359-361.

[4]Some cases, based upon the Spanish law of community property have adopted the view that the lawful wife rightfully takes one-half and the putative wife one-half, leaving the husband nothing, upon the ground that by his conduct he has forfeited his community property rights in the community acquired during the putative marriage, as in Louisiana: *Waterhouse* v. *Star Land Co.* (1916) 139 La. 177 [71 So. 358, 359-360]; *Fulton Bag & Cotton Mills* v. *Fernandez* (La.App. 1935) 159 So. 339, 343.

The court in *Estate of Ricci, supra,* 201 Cal.App.2d 146, seems to have followed this rule, while in *Blache* v. *Blache, supra,* 69 Cal.App.2d 616, 624, it was not followed.

Pursuant to Civil Code section 4452, operative January 1, 1970, property acquired during the putative marriage is termed "quasi-marital property" and is divided equally between the parties under Civil Code section 4800; but no resolution is made of the conflicting claims of the lawful and putative spouse.

respects the findings of fact and conclusions of law are amply supported except as noted in this opinion.

Objections taken to the relief sought in this proceeding, debating whether this is a direct or collateral attack on the divorce decree, are answered by *Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d 540, 558. ■ This is a direct attack, permitting the introduction of extrinsic evidence, which may be made either by motion or independent action (*Olivera* v. *Grace* (1942) 19 Cal.2d 570, 577 [122 P.2d 564, 140 A.L.R. 1328]). Having found the divorce decree to be void, the imposition of a constructive trust is an appropriate remedy. (*Caldwell* v. *Taylor* (1933) 218 Cal. 471, 475 [23 P.2d 758, 88 A.L.R. 1194].)

The circumstances here, whether characterized as extrinsic fraud or extrinsic mistake, support relief to plaintiff where there was no fair adversary trial. (*Olivera* v. *Grace, supra,* 19 Cal.2d at pp. 577-578; *Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d at pp. 558-559.) ■ A judgment is properly challenged in equity when it is claimed to have been rendered without legal service of process or legal notice to a defendant. (*Rivieccio* v. *Bothan, supra,* 27 Cal.2d 621, 624.) There need not be actual fraud. Extrinsic fraud that deprives the adversary of a fair hearing may exist, though only the result of mistake. (*Davis* v. *Davis* (1960) 185 Cal.App.2d 788, 793-794 [8 Cal.Rptr. 874].)

■ Compliance with statutory conditions for constructive service is jurisdictional (*Sternbeck* v. *Buck* (1957) 148 Cal.App.2d 829, 832 [307 P.2d 970]) and a person not designated by her name is not a proper party to an action (*Fuss* v. *City of Los Angeles* (1958) 162 Cal.App.2d 643, 646 [328 P.2d 831]).

■ California adopts the view that anyone may change his name without legal proceedings. The purpose of the statutory procedure is to have, whenever possible, a record of the change. (*In re Ross* (1937) 8 Cal.2d 608, 609 [67 P.2d 94, 110 A.L.R. 217].) There is nothing in the law that provides that the legal name of a wife becomes changed, ipso facto, when her husband assumes another name or even has it recorded under the statutory procedure, in the absence of her consent, acquiescence, or concurrent change by herself. In cases involving title to property, it is common and usually necessary to sue a married woman in the name in which she held title. ■ Where the marriage status is of public record, we hold that any proceedings for its dissolution after change of name must be in the name of record. The civil registry of the town of Porto, Azores, recorded the marriage in Santo Espirito of Manuel Joaquim de Sousa and

*Maria Jacinta de Sousa,* the *Sousa* surname being unchanged by the marriage of cousins.

The trial court found there was no estoppel and we find no reason to overturn this determination. (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 266 [42 Cal.Rptr. 89, 398 P.2d 129]; cf. *Brown* v. *Brown* (1969) 274 Cal.App.2d 178, 192 [82 Cal.Rptr. 238].) .

While diligence is enjoined upon those who seek to avoid default judgments, "What is initially void is ever void and life may not be breathed into it by lapse of time." (*City of Los Angeles* v. *Morgan* (1951) 105 Cal.App.2d 726, 731 [234 P.2d 319], citing *Lapham* v. *Campbell* (1882) 61 Cal. 296, 300.) One is not barred by alleged laches in negligence in failing to discover sooner her rights have been injured by the fraud of another. No person is compelled to act in a judicial proceeding in which jurisdiction over her person has not been obtained. (*Lapham* v. *Campbell, supra,* 61 Cal. 296, 300.)

Since the invalidity of the decree of divorce was a contention in the pretrial order superseding the pleadings (*Feykert* v. *Hardy* (1963) 213 Cal.App.2d 67, 74 [28 Cal.Rptr. 510]), it is appropriate to make a finding, and so we find (Code Civ. Proc., § 909) that the divorce decree in Freitas v. Freitas entered on December 30, 1919 in action No. 48418 in the Superior Court of Alameda County, Judgment Book 137, page 259, California, is void and should be vacated. The conclusions of law made by the trial court are sufficient in this respect.

Conclusions of law 6, 7, 8 and 9 in relation to the respective property interest of Maria Sousa and Catherine Freitas are modified so as to reflect their respective property interests as above determined.

Paragraph 2 of the judgment herein is hereby modified, to provide that "upon completion of the probate proceedings and distribution therefrom there is ordered distributed one-fourth to Maria Jacinto Sousa, and three-fourths to Catherine E. Freitas."

Paragraph 3 is hereby modified to provide that the property and estate in possession of defendant Catherine E. Freitas and the proceeds and income from and after the death of Manuel S. Freitas is ordered distributed and transferred forthwith as to one-fourth of all said property to Maria Jacinto Sousa; and that the trial court retains jurisdiction to make all

necessary orders to effectuate an accounting for and distribution to plaintiff as herein provided.

As so modified the judgment is affirmed. Each party will bear his own costs on this appeal.

Shoemaker, P. J., and Taylor, J., concurred.

Petitions for a rehearing were denied September 18, 1970, and appellants' petition for a hearing by the Supreme Court was denied October 15, 1970.