[No. B149100. Second Dist., Div. Eight. Apr. 30, 2003.]

CUNA MUTUAL LIFE INSURANCE COMPANY, Plaintiff and Appellant, v.
LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, Defendant and Respondent.

COUNSEL

Hill, Farrer & Burrill, Kevin H. Brogan and Dean E. Dennis for Plaintiff and Appellant.

Wasserman, Comden, Casselman & Pearson, David B. Casselman, Rebecca J. Schroer, Elsa H. Jones and Jeffrey F. Kagan for Defendant and Respondent.

OPINION

RUBIN, J.—This appeal arises out of an inverse condemnation action brought by CUNA Mutual Life Insurance Company, the owner of the historic El Capitan Theater Building, against the Los Angeles County Metropolitan Transportation Authority to recover costs CUNA incurred to protect the building from damage it anticipated would be caused by excavation for and construction of the Hollywood/Highland Metro Rail Station.[1] After a simultaneous court and jury trial on the issues of liability and damages, respectively, the trial court dismissed the jury and entered judgment in favor of MTA, finding "insufficient evidence that the . . . station construction . . . caused damage to the El Capitan. Without actual or prospective damage proved, there can be no inverse condemnation award."

On appeal, we consider two questions: (1) did the trial court utilize the correct legal standard in deciding that CUNA's mitigation expenses were not recoverable; and (2) is compensable physical injury necessary before a

---

[1]Various predecessor agencies to the Metropolitan Transportation Authority were involved in the design and construction of the metro rail station project at issue here. For ease of reference, we use MTA even where the record refers to one of those predecessor agencies. The original complaint was filed by Century Life of America. Century Life was the lender on the El Capitan Theater Building and acquired it in February 1994, after the Northridge earthquake. Appellant CUNA is an affiliate of Century Life of America. For ease of reference, we use "CUNA" or the term "the Building owner" interchangeably to refer to CUNA Mutual Life Insurance Company, Century Life, its representatives and counsel for those entities through which most of the negotiations with MTA were held. We refer to the El Capitan Theater Building as the "Building."

property owner may recover mitigation expenses.[2] We conclude: (1) a property owner is entitled to recover reasonable costs incurred to mitigate damage to the property that the property owner reasonably and in good faith believed would be caused by a work of public improvement even if post-mitigation events indicate there would have been no damage; (2) the trial court prejudicially erred by requiring CUNA to show that, "but for" the mitigation repairs, the Building in fact would have been damaged; and (3) actual physical damage to the subject property is not a prerequisite to an award of mitigation damages. Accordingly, we reverse and remand for a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

Built in 1926, the Building is listed on the National Register of Historic Places, and the Los Angeles Conservancy holds a conservation easement that requires the Building owner to preserve it in good repair. Constructed of reinforced concrete, the Building is comprised of a six-story office building located on the northern most portion of the lot, facing onto the Hollywood Walk of Fame on Hollywood Boulevard. An attached theater is situated behind the office building. A full basement below the footprint of the office building extends beyond the north property line to below the Walk of Fame. A subbasement is located below the footprint of the office building. Except for the basement walls beneath the Walk of Fame, the foundation for the Building consists of a series of piles, the tips of which are driven into old alluvium soil.[3]

The tunnels for the Hollywood/Highland Metro Rail Station (the station) run beneath Hollywood Boulevard and pass directly north of the Building. The station itself is located just beyond the Building's northeast corner. In preparation for construction of the subway system, MTA commissioned a series of investigations resulting in reports regarding the geotechnical characteristics of the land affected by the project. According to a May 1990

---

[2]CUNA articulates its contentions as follows: (1) under *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129] (*Albers*), mitigation damages are recoverable if the property owner acted reasonably and in good faith; (2) the trial court's requirement that it prove additional damages is contrary to *Albers*; (3) concern that construction of the station may not have damaged the Building was misplaced in that the tunneling had already caused the Building to settle; (4) requiring proof that underpinning was in fact necessary unfairly minimizes the contemporaneous recommendations of the Building owner's advisers.

MTA contends that (1) the evidence supported the trial court's conclusion that CUNA did not to act reasonably; and (2) mitigation damages are not recoverable in the absence of physical injury to or other taking of property.

[3]Old alluvium soil, found below young alluvium soil, is stronger and denser than young soil.

report: "The need for underpinning the adjacent existing buildings depends on whether their foundations are adequate or whether the buildings can satisfactorily undergo the anticipated settlements due to excavation and construction. Each adjacent building should be evaluated on a case-by-case basis."

According to a January 1992 report, the Building was located "outside the zone of influence of the tunneling. However[,] the basement vault beneath the Hollywood Boulevard sidewalk, which is not pile supported, will be affected by the tunneling." This report anticipated minor cracking to the Building facade, but recommended any damage be repaired after tunneling was completed.

A November 1993 report predicted station excavation could cause "some ground settlement or angular distortion at ground surface within 60 to 70 feet of station outline." At its closest point, the excavation for the station was expected to be approximately 14 feet from the face of the Building. The November 1993 report opined settlement and angular distortion would "generally be small, if proper construction techniques are followed."[4]

In January 1994, the Building was extensively damaged in the Northridge earthquake. The most serious damage occurred at the Building's west wall, primarily at the south end, less so at the north end. Seismic upgrades to the west wall began that summer and were completed by September 1994.

Meanwhile in 1994, MTA had begun tunneling along Hollywood Boulevard in the first stage of construction of the Metro Rail Red Line. In August 1994, tunneling stopped because of excessive settlement. Tunneling eventually recommenced, and by March 1995, both the north and south tunnels had passed in front of the Building. The tunneling caused building settlement of almost one-fourth (0.23) inch.

In June 1995, the Building owner hired The J. Byer Group, Inc., a geotechnical consulting firm (J. Byer), to assist in the design and completion of seismic upgrading by evaluating the engineering properties of the earth materials beneath the Building. In this context, J. Byer employed various subsurface exploration techniques, including manometer surveys on the basement and subbasement levels of the Building, in addition to using data

---

[4]According to MTA's expert witness at trial, "angular distortion of 1 over 500 is the point at which, in most large structures, cracks appear."

obtained from MTA.[5] J. Byer advised that the manometer surveys were also useable to quantify building settlement associated with construction of the station. In August 1995, Ryland Associates prepared a seismic hazard evaluation of the Building using, among other things, data obtained from previous reports, including those obtained from MTA.

In October 1995, J. Byer informed the Building owner that surveys conducted on behalf of MTA between August 1993 and May 1995 established the Building had settled one-fourth of an inch. Similar surveys conducted on behalf of the Building owner concluded the Building had settled between one-fourth and one-third of an inch. J. Byer opined that construction of the station "will induce more than ¼ inch of settlement on a portion of the building. [MTA reports indicated that] one episode of very rapid settlement accounted for most of the settlement during construction of the tunnels. It might be structurally unacceptable to incur ½ inch or more of rapid settlement before defensive measures are taken. It is recommended that the structural engineer establish what the acceptable tolerances for differential settlement are. [¶] At least ¼ inch of settlement within 50 feet of the station excavation should be expected. Therefore, defensive measures should be implemented now and not after additional settlement." J. Byer warned: "[d]eflection of the shoring system, settlement, and ground losses have occurred at other Metro Red Line station construction sites and should be anticipated for this site." Structural engineers Ismail Associates, Inc., advised the Building owner to ensure that MTA was taking steps to prevent problems relating to the proximity of the construction to the Building.

In a letter dated November 20, 1995, counsel for the Building owner requested MTA to underpin the front portion of the Building. At a meeting on March 13, 1996, after several months of negotiations, MTA agreed to pay $23,500 for the design of an underpinning system and a portion of the construction costs of a support system for the north wall of the Building. The offer was confirmed in writing on March 28.[6] At the time, work on the station was slated to begin on May 17. Less than two weeks later, the

---

[5]Accurate within two-tenths of an inch, the results of a manometer survey "are generally used to quantify the effects of foundation and slab settlement, deflection, or heaving."

[6]In a letter to CUNA's counsel, the MTA stated it "wish[ed] to cooperate with the management of the El Capitan Building (Building) in taking reasonable measures to protect the Building from settlement that may be caused as a result of the Metro Red Line Hollywood/Highland station excavation. [¶] Although the MTA does not agree that the amount and location of settlement reasonably expected to result from station excavation will be significant enough to cause damage to the Building, the MTA, in the spirit of cooperation and community goodwill, agrees to pay up to $23,500 of engineering design and geotechnical analysis costs incurred by the Building for purposes of designing a support system for the north wall of the Building. . . . [¶] The MTA is also willing to pay a portion of the

Building owner's structural engineering firm, Robert Englekirk Consulting Structural Engineers, Inc., (REI) gave MTA its proposal for "the design of permanent underpinning for vertical loads of those elements of the Building affected by the construction of the MTA Hollywood/Highland Station" for an estimated fee of $50,000, on a time and material basis due to the "great uncertainty in work involving underpinning existing buildings." The design-build firm of Hayward Baker, Inc., proposed to do the construction work in accordance with the scope of work outlined by REI for $526,000.

At a meeting on April 29, REI provided MTA with a written description of the proposed underpinning scheme. MTA proposed an alternate scheme. The disadvantages of the MTA scheme, according to REI, were that it placed a new basement wall foundation system in unstable soil, did not provide specific protection of the pile foundations of the office tower columns, and required regular monitoring with a hydraulic jack, which could disrupt operation of the Building and make the basement unusable for some time.

In response to MTA's request for more information "on the issue of whether settlement is expected," REI explained its opinions were based on the 1995 J. Byer reports. REI concluded: "It is the opinion of REI that although the shoring system documents developed for the Station are well-designed, the system is not adequate to avoid settlement at the El Capitan Building. . . ."

CUNA offered to accept $500,000, a portion of the estimated $800,000 total cost of underpinning in accordance with the REI scheme, in exchange for which MTA would receive a $500,000 credit against any claim of physical damage to the Building as a result of the station construction.

Unable to agree with MTA on a plan to underpin the Building, CUNA commenced on its own the underpinning project in accordance with its engineers' recommendations. The project was completed by May 28 for a total cost of $755,787.22. Excavation for the station began on June 15 and was completed on December 1.

 ██ ██ When MTA refused to reimburse CUNA for the cost of underpinning, the Building owner filed suit for inverse condemnation.[7]

The concurrent court and jury trial commenced on November 8, 2000. On November 15, MTA moved for judgment under Code of Civil Procedure

construction costs of a support system for the north wall of the Building." The amount the MTA was willing to pay for constructions costs depended upon review of the proposed design.

[7]An inverse condemnation action is an eminent domain lawsuit initiated by one whose property was taken or damaged for public use. (*San Diego Gas & Electric Co. v. Superior*

section 631.8 on the grounds that CUNA had not established a taking within the meaning of California Constitution, article I, section 19, and, even if there had been a taking, CUNA's conduct was not reasonable.[8] Relying primarily on the same cases cited in its respondent's brief, MTA argued that there can be no constitutional taking where there is no physical injury to the Building; thus, there was nothing to mitigate and no inverse condemnation occurred. The trial court took the motion under submission and allowed both parties to introduce additional evidence. The motion was thereafter renewed and eventually denied. On November 17, 2000, outside the presence of the jury, the court heard final argument on whether there was a compensable taking and whether mitigation damages were recoverable. On November 20, the court ruled in favor of MTA. It dismissed the jury and granted judgment in favor of MTA.

In its written statement of decision, the trial court found the Building had settled one-fourth inch following the construction of the tunnels, and the Building owner was "rightly concerned about [the] possibility" that excavation for and construction of the station would cause building settlement in addition to the one-fourth inch caused by the tunnel excavation. It found, however, that the Building owner could not reasonably rely on the recommendations of its licensed engineers that station construction would cause damage to the Building because, the court found, the engineers' warnings were not "within a reasonable degree of professional certainty." The trial court noted that CUNA did not offer expert testimony "that the station box construction would have . . . damaged the building," whereas MTA offered expert evidence that the construction would not have done so. The trial court concluded there was "insufficient evidence that the later station construction . . . caused damage to the El Capitan. Without actual or prospective damage proved, there can be no inverse condemnation award." Judgment and a final statement of decision were filed on January 29, 2001.

CUNA timely appealed from the judgment.

---

*Court* (1996) 13 Cal.4th 893, 939-940 [55 Cal.Rptr.2d 724, 920 P.2d 669]; see also *Belmont County Water Dist. v. State of California* (1976) 65 Cal.App.3d 13, 19, fn. 3 [135 Cal.Rptr. 163]; *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 601 [96 Cal.Rptr.2d 897]; *Barham v. Southern Cal. Edison Co.* (1999) 74 Cal.App.4th 744, 755 [88 Cal.Rptr.2d 424].)

The complaint also sought monetary damages for actual harm to the Building caused by the tunnel construction. The trial court found CUNA had failed to prove that the settlement caused by the tunnel construction resulted in any compensable damage to the Building. "Mindful of the substantial evidence standard on that claim," CUNA expressly does not appeal from that portion of the trial court's decision.

[8]Code of Civil Procedure section 631.8 permits the court in a trial without a jury to enter judgment in favor of a defendant after the plaintiff has completed the presentation of its evidence. The court, as the trier of fact, weighs the evidence.

## DISCUSSION

*Standard of Review*

■ The question of whether there has been inverse condemnation is a mixed question of law and fact. (*Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246, 250 [91 Cal.Rptr.2d 458].) In deciding a mixed question, the trial court must: (1) establish the historical facts; (2) select the applicable law; and (3) apply the law to the facts. We review the trial court's determination of the historical facts for substantial evidence but afford questions of law plenary review. If application of the law to the facts is essentially factual, the trial court's determination is reviewable under the clearly erroneous standard. " 'If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.' " (*People v. Louis* (1986) 42 Cal.3d 969, 987 [232 Cal.Rptr. 110, 728 P.2d 180], quoting *United States v. McConney* (9th Cir. 1984) 728 F.2d 1195, 1202; also quoted by *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960], and *McGhan Medical Corp. v. Superior Court* (1992) 11 Cal.App.4th 804, 810 [14 Cal.Rptr.2d 264].)

■ The issues for us to decide here are essentially legal: (1) the meaning of the terms "reasonable and in good faith" as used in applicable Supreme Court authority, and (2) whether actual damage to the property is a prerequisite to recovery of mitigation damages in an inverse condemnation action. Accordingly, we review the trial court's determination de novo.

*In Order to Establish Its Mitigation Efforts Were Reasonable and in Good Faith, a Property Owner Need Not Prove That "But For" Its Efforts the Property Would Have Been Damaged*

Although the parties approach the issue by taking somewhat different tacks, they generally agree that this case is largely controlled by our Supreme Court's decision in *Albers, supra,* 62 Cal.2d 250. *Albers* is a seminal case in the field of eminent domain as it established the rule that a public entity is liable for damage it causes to private property "whether foreseeable or not." (*Id.* at p. 264; see also *Holtz v. Superior Court* (1970) 3 Cal.3d 296, 304 [90 Cal.Rptr. 345, 475 P.2d 441].) For our purposes, however, it is the court's discussion of mitigation of damages in inverse condemnation cases that is of interest. We start our analysis there.

*Albers* arose out of landslides in the Palos Verdes Hills triggered by the placement of 175,000 cubic yards of dirt in, and on either side of, a road

easement obtained by the County of Los Angeles for the purpose of extending Crenshaw Boulevard. Certain affected property owners sued the county. The trial court expressly found that the county had not acted negligently and had not committed a nuisance or a trespass. Nevertheless, it awarded judgment in favor of plaintiffs on an inverse condemnation theory. The county argued on appeal that, since the trial court had found in its favor on the common law causes of action and, therefore, if the defendant had been a private party, judgment would have been in its favor, the same rule should apply to a public entity. (*Albers, supra,* 62 Cal.2d at pp. 255-256.) The Supreme Court rejected this argument, concluding that under former article I, section 14 of the state Constitution—the takings clause—a private landowner is to be compensated for taking or injury to property irrespective of the public entity's negligence. (*Albers,* at pp. 263-264.)[9]

The issue that concerns us here was one presented by the *Albers* plaintiffs, who appealed from the part of the judgment that denied "recovery for expenditures they made in attempting to determine the cause of the landslide and to prevent or minimize further damage." (*Albers, supra,* 62 Cal.2d at p. 268.) The trial court found that the expenses were reasonable and expended in good faith but refused to award them as damages.[10]

In reversing the trial court on this latter issue, the Supreme Court acknowledged the lack of California authority supporting recovery for mitigation of damages in condemnation proceedings. So it turned to other states with similar constitutional provisions. It quoted approvingly from *Kane v. City of Chicago* (1945) 392 Ill. 172 [64 N.E.2d 506, 509]: "Expenses reasonably and prudently incurred in good faith in making a proper effort to *prevent* or diminish injury to the building are considered a diminution in the fair cash market value of the real estate, and as such are proper items to be recovered." (Italics added.) And from a New York inverse condemnation case: " 'The rule is of general and widespread application that one who has been injured either in his person or his property by the wrongful act or default of another is under an obligatory duty to make a reasonable effort to minimize the damages liable to result from such injury, and that if he does not make such reasonable effort he will be debarred from recovering for those additional damages which result from such failure' [Citation] . . . and

---

[9]The relevant constitutional provision is now found in California Constitution article I, section 19, which provides in part: "Private property may be taken *or damaged* for public use only when just compensation . . . has first been paid to . . . the [building] owner." (Italics added.) Although the language differs slightly from former section 14, the change does not affect our analysis of *Albers.*

[10]The monies were spent to employ geologists and engineers, conduct surveys, drill test holes, construct shear-pin caissons, and prevent erosion. (*Albers, supra,* 62 Cal.2d at p. 268, fn. 4.)

that '. . . the injured party who makes a successful effort to avoid or reduce damages will be allowed to recover the expenses necessarily incurred in so doing, but also that *he will be allowed to recover the expenses of a proper effort even though it proves unsuccessful.*' " (*Zidel v. State* (1949) 198 Misc. 91, 98 [96 N.Y.S.2d 330, 337], italics added, quoting *Norske Ameriekalinje v. Sun Printing & Publishing Association* (1919) 226 N.Y. 1, 7 [122 N.E. 463, 465].)

Our Supreme Court, additionally citing cases in a substantial number of other jurisdictions, concluded that no "reason appears why the rule in California should be harsher than that of our sister states." (*Albers, supra,* 62 Cal.2d at p. 272.)

██ The principles that derive from *Albers* are as follows: (1) the costs of mitigation efforts are recoverable in inverse condemnation actions if they are reasonable and undertaken in good faith; and (2) it is "irrelevant" that the mitigation efforts may have failed. (*Albers, supra,* 62 Cal.2d at p. 272.)

██ The parties generally agree that the foregoing is the applicable law. Where they part company is on whether the trial court correctly followed *Albers* in this case. Thus, MTA acknowledges in its brief that *Albers* does not require mitigation efforts to be successful for them to be recoverable. It does not appear to quarrel with the trial court's implied finding that CUNA acted in good faith. It does contend that the trial court correctly found that CUNA "acted unreasonably in choosing to construct extensive underpinning, based on the limited analysis of its 'experts.' "

CUNA, on the other hand, argues that the trial court, while giving judicial lip service to *Albers,* actually imposed on CUNA the additional burden of proving that "but for" the mitigation efforts, the Building in fact would have been damaged. This test, it contends, was expressly rejected by the Supreme Court.

In order to determine whether the trial court correctly applied *Albers* or added an element not authorized by the Supreme Court, we turn to a more thorough analysis of the trial court's statement of decision. Additionally, we are aided by the court's thorough explanation of its analysis during oral argument and by its ruling denying MTA's motion under Code of Civil Procedure section 631.8. First, we observe that the statement of decision does not contain an express finding of good faith. The trial court noted that CUNA contends it acted in good faith, but the court does not state whether it agrees or disagrees with CUNA's position. However, a reading of the entire statement of decision, coupled with the trial court's oral statement during closing argument that "I think the client [CUNA] was acting in good

faith," leads us to conclude that the trial court did so find. MTA does not press the point on appeal.

The more weighty issue is how the trial court addressed the "reasonableness" component of *Albers*. There is no question that the court was mindful of the Supreme Court's decision, as the parties argued from it extensively and the trial judge referred to it by name in his statement of decision and during his oral pronouncements from the bench. It is also apparent that he understood that the *Albers* test required a showing of reasonableness. This can be seen from his ruling denying MTA's earlier motion: "The court's reading of *Albers* is that mitigation steps may be taken if damage is reasonably threatened by the public improvement."

In his oral remarks, the trial court stated that the premitigation investigation by CUNA's experts was not reasonable. "I think that more investigation was necessary." If by that the trial court meant the experts' work was shoddy, below the standard of care, or otherwise not worthy of sufficient weight, then it might have been unreasonable for CUNA to have relied on them, and CUNA would have failed to meet the *Albers* mandate. It is not clear to us, however, that was what the trial court meant. More importantly, the statement of decision does not use the word "reasonableness" in that context. ▮ We, of course, are bound by the familiar rule that it is the trial court's ruling, not its oral explanation, that governs. (See *Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1756 [54 Cal.Rptr.2d 512]; 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 403, p. 463.) So, we proceed to the statement of decision.

The trial court in its statement mentions the concept of reasonableness on four occasions. Each time, the court links reasonableness with proof that the Building in fact would have been damaged but for CUNA's mitigation efforts. For example, the court writes: "The engineers, however, did not advise CUNA that the contemplated construction *would cause building damage* within a reasonable degree of professional certainty." And: "[CUNA], in the court's view, may not reasonably rely on experts' opinions in undertaking an expensive mitigation project, the cost of which it hopes to charge to a public agency, unless its experts advise that they have made a thorough independent analysis of the construction plans and have determined that the construction project *will more likely than not cause injury to the building.*" In response to CUNA's argument that *Albers*'s requirement of good faith and reasonableness protects the public entity: "This court does not construe that statement to mean that a property owner should be reimbursed for voluntarily-incurred mitigation expenses even if the property owner cannot establish by a preponderance of the evidence that its property *would*

*have been damaged absent the mitigation measures. A property owner's claim, under those circumstances, although earnestly pressed, would not be reasonable.*"[11]

The clearest example of the trial court equating reasonableness with a "but for" standard is found in the statement of decision, although the court does not use the word "reasonableness" at that juncture: "A plaintiff in [an] inverse condemnation action must establish, by the preponderance of evidence standard, that the government action would have damaged its property absent mitigation efforts."

 These statements lead us to conclude that the court required CUNA not to prove merely that it acted reasonably in deciding to undertake mitigation measures but that, preconstruction, its experts were required to advise CUNA that the public project "would cause building damage," and postconstruction, CUNA would have to prove "by a preponderance of the evidence that its property would have been damaged absent mitigation measures."

The "but for" test articulated by the trial court finds no support in *Albers* and is not compelled by public policy. First, there is a strong policy embedded in various facets of our law that mitigation is favored. (See *Albers, supra,* 62 Cal.App.2d at p. 272, & fn. 5.) Second, in the context of condemnation actions there are particularly forceful reasons to encourage mitigation. "[I]t would seem that the pubic interest would be served by allowing the possibility of such a recovery: the owner, who is ordinarily in the best position to learn of and guard against danger to his property, would thereby be encouraged to attempt to minimize the loss inflicted on him by the condemnation, rather than simply to sit idly by and watch otherwise avoidable damages accumulate." (*Id.* at p. 272.) Although MTA decries CUNA's position as carte blanche to improve one's property by passing on construction costs to a public entity, *Albers* expressly holds that "the requirements of good faith and reasonableness" provide adequate protection to the public agency. (*Ibid.*)

On the other hand, adding the dual burden of requiring a consulting expert in advance to opine that in fact damage will be suffered, and an expert witness to testify during litigation that damage in fact would have been suffered, provides an unnecessary impediment to reasonable mitigation efforts. It also creates a concomitant risk that the public will have to pay for damage to property that could have been avoided. If the property owner is

---

[11]We have italicized certain portions of the statement of decision.

unable to secure the services of an expert who will state with reasonable certainty that, but for the mitigation efforts, damage will occur, or if the owner is fearful that similar testimony in hindsight will not be believed by the trier of fact, it may be reluctant to take reasonable steps to avoid loss. In that situation, if damage does in fact occur, we are confident a public agency would argue for a reduction in the amount of compensation because of an unreasonable failure to undertake feasible mitigation measures. (*Albers, supra*, 62 Cal.2d at p. 271; *Sheffet v. County of Los Angeles* (1970) 3 Cal.App.3d 720, 731, fn. 8, 732 [84 Cal.Rptr. 11].)

Finally, we observe that the "but for" test adopted by the trial court is at odds with another principle endorsed by *Albers*: that mitigation expenses are recoverable even though they are not successful. (*Albers, supra*, 62 Cal.2d at p. 271.) "That the efforts to prevent further damage failed is irrelevant . . . ." (*Id.* at p. 272.) Under *Albers*, the test remains one of reasonableness: either that mitigation efforts were reasonable but unsuccessful and further damage accrued, or that in fact the mitigation efforts, although reasonable, turned out to be unnecessary, is not dispositive.[12]

Our conclusion that the trial court employed the incorrect legal standard in assessing the evidence does not end our inquiry. We asked for additional briefing from the parties on whether such a conclusion requires a remand to

---

[12]We do not suggest that the Supreme Court's use of the word "irrelevant" means that testimony from expert witnesses that without the mitigation efforts the property would not have been damaged, or that a reasonable expert preconstruction would not have opined that damage would occur is necessarily inadmissible. We hold only that the "but for" test is not the legal standard by which reasonableness is judged. We also conclude that the rule is that the reasonableness of a property owner's mitigation efforts "must be judged in the light of the situation confronting him at the time the loss was threatened and not by the judgment of hindsight." (*Green v. Smith* (1968) 261 Cal.App.2d 392, 396 [67 Cal.Rptr. 796].) This principle, although articulated in litigation involving private parties, applies equally to inverse condemnation matters.

Although *Albers* did not purport to describe the type of evidence relevant to a determination of reasonableness, certain areas of inquiry come to mind. One is a comparison of the likelihood of actual damage and its cost to repair with the cost to mitigate. These factors may work on a sliding scale. (See *Albers, supra*, 62 Cal.2d at p. 271 [mitigation must be " 'proportioned to the injury and consequences to be averted' "].) It may be reasonable to pay $10,000 in mitigation to avoid spending $500,000 in subsequent repairs even though the likelihood of damage is only 35 percent. Another factor may be the uniqueness of the property. Here the El Capitan is listed on the National Register of Historic Places, and the Los Angeles Conservancy holds a "good repair" easement on the Building. The loss of the Building's facade would have far greater consequences than could be quantified solely by the cost of repair. Thus, on the sliding scale referred to above, mitigation might appear to be more reasonable even with a smaller likelihood of injury and greater mitigation costs. Finally, other legal obligations of the property owner and interests of third parties might support a finding of reasonableness or the opposite.

the trial court or whether the state of the record permits this court to affirm or reverse outright. Not surprisingly, the parties' arguments are diametrically in opposition. CUNA urges us to decide the issue in its favor and reverse because the underlying facts are not contested and support only a finding that it acted reasonably. MTA says the trial court's error was harmless and contends that "this Court should review the evidence to determine whether it supports the decision under the proper reasonableness standard." MTA argues that such a review compels affirmance. We conclude that remand is necessary.

█ MTA correctly points out the venerable rule that a judgment may be affirmed on any basis supported by the record even if not expressly relied upon by the trial court. (See *Lawless v. Calaway* (1944) 24 Cal.2d 81, 93-94 [147 P.2d 604]; *Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1 [119 Cal.Rptr.2d 606].) This requires CUNA to demonstrate that the complained of error was prejudicial. In the instant case, if the trial court had used the correct standard, review of its decision would have been measured by the substantial evidence rule. █ "It has been held that the question whether an injured party acted reasonably to mitigate damages is a matter to be determined by the trier of fact and that the scope of review on appeal is circumscribed by the 'any substantial evidence' rule." (*Green v. Smith, supra*, 261 Cal.App.2d at p. 397.) █ Accordingly, for us to affirm or reverse outright, we would have to find that, applying the substantial evidence test, a reasonable trier of fact could have reached only one result. We must remand if substantial evidence would have supported judgment in favor of each party. That is the state of the record.

We need not belabor the point. Aside from the fact that there were 97 exhibits received in evidence (and over 400 marked for identification), three versions of the statement of decision, and the trial judge denied MTA's motion under Code of Civil Procedure 631.8 by concluding the evidence at that stage of the litigation "satisfies the reasonableness requirement" yet ultimately found against CUNA, our review of the evidence causes us to conclude that there was substantial evidence on both sides that would have supported a finding one way or the other on the reasonableness of CUNA's conduct.

We summarize just a portion of the evidence on each side.[13] On CUNA's behalf, when it prepared its September 1995 report, CUNA's geotechnical expert J. Byer performed its own subsurface exploration, including manometer surveys on the basement and subbasement levels of the Building. The

---

[13]Additional facts are set forth in the "Factual and Procedural Background" part of our opinion.

Building owner also retained Jennings Engineering Company (Jennings) to perform survey and monitoring independent of that being done by MTA. J. Byer used data from its own and the Jennings surveys, in addition to data obtained from MTA, to conclude the Building had settled between one-fourth and one-third inch as a result of the tunnel construction and that station construction would induce settlement of more than one-fourth inch on a portion of the Building. In an October 18, 1995 memo to the Building owner, J. Byer described the techniques MTA intended to implement in the station construction, which information was gleaned from the contract documents between MTA and its contractors. J. Byer warned the Building owner: "It might be structurally unacceptable to incur ½ inch or more of rapid settlement before defensive measures are taken. It is recommended that the structural engineer establish what the acceptable tolerances for differential settlement are. [¶] At least ¼ inch of settlement within 50 feet of the station excavation should be expected. Therefore, defensive measures should be implemented now and not after additional settlement." J. Byer recommended underpinning the Building "[i]f the structural engineer determines that differential settlement of the northeastern portion of the foundation line A0.5 is detrimental to the structural integrity of the building . . . ." The Building owner's structural engineer, REI, proposed an underpinning scheme and warned that the shoring system suggested by MTA was "not adequate to avoid settlement at the El Capitan Building." Thus, there was substantial evidence that the Building owner's experts did, in fact, make a thorough independent analysis of the construction plans and determined that mitigation measures were appropriate to avoid the risk of damage to the Building. Finally, the evidence was undisputed that, two years before station construction commenced, MTA had been required to stop tunnel construction due to excessive settlement. A trier of fact could find CUNA's reliance on its experts reasonable under the circumstances.

On the other hand, substantial evidence also supported MTA's position that CUNA's conduct was unreasonable. Girish Roy, an MTA engineer, testified to the steps taken in advance of station excavation to ensure that a proper support system was in place. Although an earlier earth technology report expressed concerns about settlement, the specifications for the station were intentionally designed to eliminate those potential problems. Expert witnesses William Cole, an engineering geologist, and Patrick Shires, a geotechnical engineer and geophysicist, testified that the piles on which the Building was founded and the soldier piles installed during construction reduced the likelihood of settlement. Mr. Shires also testified about the relationship between angular distortion and likely tilting, concluding that no damage would have occurred. MTA's witnesses were critical of the opinions

expressed by CUNA's witnesses. Finally, there was evidence that none of the neighborhood buildings that were not underpinned suffered any damage, and that the earlier settlement of the Building caused no actual physical damage. This, and other evidence, was sufficient to support a finding under the correct legal standard that CUNA did not act reasonably.

Because we cannot determine the reasonableness issue as a matter of law, we must remand for a new trial on that issue.[14]

*MTA's Additional Arguments*

■ MTA also contends that CUNA may not recover mitigation damages because there was no physical damage to the property and also because mitigation efforts here were designed to avoid future harm rather than to remedy an existing problem. We reject both arguments.

In *Albers* the Supreme Court did not establish as a prerequisite to the recovery of mitigation costs that the property owner show actual physical damage to the property or hold that mitigation designed to obviate only future harm was noncompensable. Although the issue was not strictly before the court because the landslides had occurred before mitigation efforts were undertaken, the court's analysis of mitigation costs as damages reflects disagreement with the position MTA now takes. As to future harm, on two occasions the high court quoted approvingly from the out-of-state cases to which we referred earlier. First: "Expenses reasonably and prudently incurred in good faith in making a proper effort to **prevent** or diminish injury to the building are considered a diminution of the fair cash market value of the real estate, and as such are proper items to be recovered. [Citations.]" (*Albers, supra,* 62 Cal.2d at p. 270, italics omitted, boldface added.) Later: " '[I]t is held as a natural corollary to this rule of duty, not only that the injured party who makes a successful effort to **avoid** or reduce damages will be allowed to recover.' " (*Id.* at p. 271, boldface added.) These references to "preventing" and "avoiding" damage in contrast to "diminishing" or "reducing" harm reflect an unmistakable approval of the notion that reasonable, good faith mitigation that avoids future harm is just as important to the public good as are actions taken to lessen the impact of previous damage.

Similarly, in describing the type of damage compensable in inverse condemnation proceedings, the court stated, " 'Any definite physical injury

---

[14]We express no opinion on whether the trial judge must reopen the case in whole or in part to admit additional evidence, or whether it may rely on the state of the record and apply the proper legal standard to the evidence already received.

to land or an invasion of it cognizable to the senses, depreciating its market value, is a damage in the constitutional sense . . . .' " (*Albers, supra,* 62 Cal.2d at p. 260.) This notion that inverse condemnation damage includes not only physical injury but other sensory invasions was reaffirmed by the Supreme Court in *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285 [142 Cal.Rptr. 429, 572 P.2d 43] (*Varjabedian*). "[P]hysical damage to property is not invariably a prerequisite to compensation [for inverse condemnation liability]. [Citations.] Rather, the determination of the scope of the just compensation clause rests on its construction ' "as a matter of interpretation and policy." ' [Citation.]" (*Id.* at p. 296.) The *Varjabedian* court reversed a judgment on the pleadings for the defendant city, concluding that the city could be liable in inverse condemnation for operation of a sewage plant that emitted septic odors that were blown onto the plaintiff's neighboring property. The fact that the injury was unlike "those core cases of direct physical invasion which indisputably require compensation," did not vitiate the inverse condemnation claim. (*Id.* at p. 297.)

Here, there was an "invasion" of plaintiff's property, as the court found that MTA's earlier construction of the subway tunnels "caused the El Capitan Building to settle slightly less than one quarter inch."[15] Likewise, it is undisputable that CUNA's mitigation efforts were designed to "prevent" or "avoid" injury. (*Albers, supra,* 62 Cal.2d at pp. 270-271.)

MTA relies principally on three cases in support of its contention that mitigation expenses are not recoverable when they are incurred to avoid only future harm and where there is no physical injury. None is persuasive. In *Placer County Water Agency v. Hofman* (1985) 165 Cal.App.3d 890 [211 Cal.Rptr. 894] (*Placer*), the water district constructed a pipeline pursuant to an acquired easement over private land, some of which was owned by the Hofmans. The Hofmans complained that the project did not comply with its own specifications and that an environmental impact report was required. The trial court awarded damages falling in several categories, one of which was mitigation expenses. The Court of Appeal reversed that award. (*Id.* at p. 903.) MTA correctly points out that in the course of its opinion that appellate court stated, "If there is no taking, it is not possible for there to be any damages *caused by* a taking." (*Id.* at p. 897, original italics.) From there, MTA argues there was no taking here and therefore mitigation damages cannot be awarded. We read the case more narrowly.

---

[15]Although the court also found that the settlement did not cause actual physical damage to the building warranting separate compensation, a finding that CUNA does not dispute (see fn. 7, *ante*), we would be hard pressed to say that causing a building on adjacent property to settle one-fourth inch was not an "invasion" of another's property interests under *Albers*.

In *Placer*, the mitigation damages were not expended to construct tangible physical solutions to harms anticipated by public projects. Rather, they "were for engineering and legal services largely incurred in a separate legal action which sought to compel the agency to comply with the project plans and EIR." (*Placer, supra,* 165 Cal.App.3d at p. 895.) The *Placer* court held that those costs were not recoverable under the relevant statute relied upon by the Hofmans. (Code Civ. Proc., § 1263.40 [damage caused to remainder where property is severed].)[16] Essentially, the Hofmans were trying to recover expenses incurred in litigation filed "to compel the agency to comply with the project EIR." (*Placer, supra,* at p. 897.) Accordingly, the costs had nothing to do with the decrease in market value necessary to support an award of mitigation expenses under *Albers.* (*Id.* at pp. 896-898; see *Albers, supra,* 62 Cal.2d at pp. 272-273; see also discussion, *ante.*) For these reasons, the court concluded the engineering and litigation expenses incurred in the prior lawsuit were not recoverable. We find *Placer* of little help in deciding whether monies spent to shore up a building in the face of major construction are compensable.

MTA also relies on *Jordan v. Santa Barbara* (1996) 46 Cal.App.4th 1245 [54 Cal.Rptr.2d 340] (*Jordan*). There, agricultural landowners filed an action for inverse condemnation and other common law torts when activities of public agencies increased the salinity of groundwater and allowed sewage to seep into a river. The landowners were particularly concerned that the buildup of vegetation in the river created a potential for future flooding of their property. Hence, they claimed, the public entities' conduct constituted inverse condemnation. (*Id.* at pp. 1255-1256.) The Court of Appeal affirmed judgment for the public agencies. MTA finds support in the following quotation from the appellate court: "The [trial] court properly concluded that risk of future flooding does not give rise to a claim for inverse condemnation. Any damages claimed by appellants are speculative." (*Id.* at p. 1261.) First of all, we note that this is not a mitigation of damages case at all. In *Jordan,* the plaintiffs incurred no expense in trying to prevent the vegetation from growing or clearing the riverbed to prevent flooding. Accordingly, the issue was not whether costs incurred in mitigating damages were recoverable in the context of inverse condemnation. Second, the quoted language reflects the appellate court's conclusion that the damages claimed were speculative because there had been no flood, there might never be a flood, and it was not possible to calculate any loss that the property owners might suffer from some unknown flood. In the present case, there is no suggestion that the damages would be speculative as the actual amounts expended by CUNA are known. Nor was the tunneling and station excavation speculative: they were

---

[16]This code section is not relevant to the present case.

scheduled to take place at the time the mitigation efforts were undertaken and had been completed by the time of trial. CUNA did not file suit for inverse condemnation immediately following the passage of a preliminary municipal resolution in support of a project that might never see the light of day. Finally, we note that the court of appeal affirmed the rule expressed in *Albers and Varjabedian* that "[p]hysical damage is not invariably a prerequisite to compensation for inverse condemnation liability." (*Id.* at p. 1257.)[17]

Finally, MTA relies on *Orange County Flood Control Dist. v. Sunny Crest Dairy, Inc.* (1978) 77 Cal.App.3d 742, 765 [143 Cal.Rptr. 803], for the rule that expenses incurred to mitigate noncompensable business losses are themselves noncompensable. (See also *City of San Diego v. Sobke* (1998) 65 Cal.App.4th 379, 400 [76 Cal.Rptr.2d 9] [mitigation costs to avoid loss of goodwill are not recoverable in the absence of a showing of goodwill].) The property owner there tried to recover fair rental value of the property during a time of temporary severance. The appellate court concluded that was an incorrect measure of damage and that out-of-pocket expenses in connection therewith (title fees, attorneys' fees, escrow costs and brokers' commissions) were not proper mitigation expenses. (*Orange County Flood Control Dist. v. Sunny Crest Dairy, Inc., supra,* 77 Cal.App.3d 742, 764-767.) As the present case does not deal with noncompensable business losses such as fair rental value or loss of goodwill, we see little application here.

## DISPOSITION

The judgment is reversed and the matter remanded. CUNA shall recover its costs on appeal.

Cooper, P. J., and Boland, J., concurred.

---

[17]Both *Jordan, supra,* 46 Cal.App.4th at page 1258, and another case cited by MTA, *Olson v. County of Shasta* (1970) 5 Cal.App.3d 336, 341 [85 Cal.Rptr. 77], state that the "very definition of a 'taking' requires an 'act' . . . , and the risk of future flooding is not an act." As we have already discussed, compensation is required when the public entity takes or causes damage to property. Under *Albers*, any invasion is sufficient. (*Albers, supra,* 62 Cal.2d at p. 260.) Here there was settlement; more fundamentally, we find any comparison of the potential for a flood with an ongoing major metro rail excavation project strained.